Filed 5/15/14  In re Michael M. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| In re Michael M. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JERRY M.,<br><br>    Defendant and Appellant. | B250413<br>(Los Angeles County<br>Super. Ct. No. CK83150) |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn Mordetzky, Judge.  Affirmed.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, Office of the County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Jerry M. (Father) appeals the juvenile court's order under Welfare and Institutions Code section 366.26, terminating his parental rights and freeing his five children for adoption by the A.'s, the foster family who had been caring for them and had committed to adopting them all.[1] Father contends substantial evidence does not support the court's finding of adoptability. We affirm the court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the five children of Father and J.A. (Mother): S born in 2006, Troy born in 2007, Kylie born in 2008, Kayla born in 2009, and Michael M. (Michael) born in 2010. The four older children were detained in July 2010. Michael was detained shortly after his birth in November 2010. The court ultimately found true that the Mother had a history of substance abuse which rendered her incapable of providing regular care of the children, that Mother needed mental health treatment, and that Mother and Father had engaged in a serious domestic altercation.[2]

After the 2010 detention, the children were initially placed in three different foster homes. Kylie and Michael were placed in the home of Virginia M. S and Troy were placed with the A.'s. Kayla, who initially was placed in a separate home, was transferred to the A.'s home in 2011. The children received good care in their respective foster homes.[3]

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    At the time of the original detention, Father was incarcerated for assaulting Mother.

[3]    In September 2011, the A.'s expressed their desire to be considered for the permanent placement of all five children. A Court-Appointed Special Advocate (CASA) for S and Troy agreed this could be "the best possible option."

A Multidisciplinary Assessment Team (MAT) evaluated the four older children early in the proceedings.[4] S was found to be emotionally volatile and aggressive toward his siblings. Troy cried excessively for his age. Kylie and Kayla showed no signs of mental health problems, but were nonetheless provided early start services through the Los Angeles Regional Center (Regional Center).[5]

In November 2011, when she turned three, Kylie was terminated from the Regional Center because she had none of the requisite disabilities. She was psychologically evaluated and was found to suffer from "[d]isruptive [b]ehavior [d]isorder," which meant that she engaged in "frequent temper tantrums, but also was found to be "unusually bright." A similar evaluation found that Kayla, then nearly two, had significant delays in receptive and expressive language skills. S, then five, was described as immature for his age, but having no apparent deficits in behavior or learning abilities. Troy, evaluated shortly before he turned four, was found to possess skills within the functional limits for his age.

The parents were provided reunification services, but made little progress during the reunification period. In October 2011, the court terminated Mother's reunification services. A few months later, it terminated Father's reunification services.[6]

---

[4]  Michael was too young to be evaluated. In early 2011, when he was four months old, he began to display seizure-like shaking. The condition, which may have been the result of Mother's drug use during pregnancy, resolved itself over time.

[5]  The Regional Center is a private nonprofit community-based organization which contracts with the State Department of Developmental Services to coordinate services for individuals with developmental disabilities. (See Lanterman Developmental Disabilities Services Act (§ 4500, et seq.); *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 486.)

[6]  In March 2012, Father was arrested for corporal injury on a spouse/cohabitant for assaulting his pregnant girlfriend. He was transferred to a detention facility to await deportation. By the time of the section 366.26 hearing, he was back in the area.

In March 2011, the caseworker had undertaken a preliminary adoption assessment. The A.'s expressed willingness to adopt S, Troy, and Kayla, the three children then in their care. Kylie's and Michael's foster mother, Virginia M., expressed willingness to adopt them.[7] In March 2012, however, Kylie and Michael were removed from Virginia's home due to a child abuse referral. They were placed in a new foster home with the C.'s.[8]

In July 2012, the four older children were in good physical health.[9] S, then almost six, was meeting his developmental milestones. Troy, then four, was meeting developmental milestones and was receiving speech therapy. He had occasional episodes of bedwetting. Kayla, two and a-half, had significant speech and expressive language delays, and was participating in speech therapy twice weekly. Kylie, three, was developing appropriately, but the diagnosis of disruptive behavior disorder had not changed. Her caregivers, the C.'s, reported that she continued to have temper tantrums and angry outbursts.[10]

During July 2012, the A.'s asked that the children in their care be provided counseling services because S and Troy fought with each other every day and were

---

[7]     The Department of Children and Family Services (DCFS) also had explored other options. In November 2011, the caseworker ordered an ICPC (Interstate Compact on the Placement of Children) investigation of a maternal aunt who lived in Georgia and had expressed interest in adopting the children. Subsequently however, the aunt informed the caseworker that she had been laid off from her job and did not have a place for them.

[8]     When the necessity of moving Kylie and Michael arose, the A.'s expressed interest in having all five children in their care, but the rules governing their foster care program prevented them from having additional children under the age of three in their home. The children's CASA had recommended that they be placed with the A.'s in 2011.

[9]     Michael, evaluated a few months later, was meeting his developmental milestones.

[10]     The C.'s advised the caseworker that due to Kylie's outbursts, they wished to have Kylie and Michael placed elsewhere.

physically aggressive at school.[11] In addition, all three of the children were engaging in destructive behavior, ripping up clothing, blankets and pillows, and Kayla was self-abusive, pulling her own hair and making her nose bleed. Despite these experiences, the A's. were committed to adopting the three children, to having the other two children placed in their home, and to eventually adopting all five. The A.'s reported they had come to know all the children through sibling visits. They stated that they cared deeply for and were attached to the children and could provide them with a permanent and loving home. The caseworker reported that S, Troy and Kayla were doing well in the A.'s care and had bonded with them, and that the A.'s adoptive home study had been approved. Later that month, the A.'s received an exemption that allowed Michael and Kylie to be placed in their home.

After being reunited in the home of the A.'s, the children began therapy with Raul Lara, M.F.T. The caseworker reported that the children and the A.'s seemed to be adjusting well and "building a solid relationship with one another." She described the children as "social and friendly" and said they were excited to live and play together on a daily basis. The A.'s initially reported no concerns, said the children were doing "'great,'" and continued to express a commitment to providing a permanent home for all five children. In October 2012, however, certain behavioral issues caused the A.'s to waver about going forward with adoption.[12] They said dealing with all five children and their individual problems was sometimes "overwhelming." They expressed concern about receiving support after

---

[11]     The A.'s reported that when S got into fights with his siblings, they were able to redirect him.

[12]     Among other things, Kylie reacted badly when disciplined. Despite therapy, Kayla continued to have serious speech development issues.

DCFS and the court ceased being involved. The caseworker held a team decision meeting (TDM) with the A.'s to inform them of the long term support available to adoptive parents. In November 2012, after the TDM, the A.'s re-confirmed their commitment to adopting all five children.

In April 2013, a month before the section 366.26 hearing, the children's therapist reported that he had observed the children displaying aggressive behavior toward each other and toward their caretakers. He had also observed "a lot of verbal and physical expression of affection and caring from the foster mother towards the . . . children, and towards the foster mother from the . . . children." He diagnosed the children as suffering from generalized anxiety disorder and possible attention deficit/hyperactivity disorder. He agreed the children were appropriately placed with the A.'s, noting that Mrs. A. "has shown a lot of interest as well as support and encouragement in the children's academic and social activities" and "implements a very caring and structured discipline style." On the eve of the section 366.26 hearing, the caseworker called the therapist seeking elaboration. The therapist told the caseworker that the children appeared to have a lot of internal anger and that the goal of the therapy was to reduce or eliminate their anger, aggressiveness, anxiety and self-abuse. He stated it might be necessary to separate the children if they continued to behave aggressively toward each other. However, he expressed the opinion that the children were well-adjusted in their placement and responded satisfactorily to discipline and their structured living environment.

In April 2013, the A.'s continued to express their commitment to adopting all the children.[13] Their home study was complete and approved. The caseworker expressed the opinion that the children were well-adjusted in the placement and

---

[13] During that same period, a paternal aunt came forward and indicated her willingness to adopt all five siblings.

appeared stable and happy. At the May 1, 2013 section 366.26 hearing, the court found by clear and convincing evidence that the children were likely to be adopted and terminated parental rights. Father appealed.

## DISCUSSION

Father contends the juvenile court's finding that the children were adoptable was not supported by substantial evidence.[14] For the reasons discussed, we disagree.

"A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.'" (*In re Valerie W*. (2008) 162 Cal.App.4th 1, 13, quoting *In re Zeth S*. (2003) 31 Cal.4th 396, 406.) Clear and convincing evidence is evidence "sufficiently strong to command the unhesitating assent of every reasonable mind." (*In re Valerie W*., *supra*, at p. 13.) We review a trial court's determination of adoptability for substantial evidence, keeping in mind the heightened standard of proof. (*In re R.C*. (2008) 169 Cal.App.4th 486, 491; see *In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1654.)

The question of adoptability "focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re Valerie W*., *supra*, 162 Cal.App.4th at p. 13.) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B*. (2009) 173 Cal.App.4th 1275, 1292, quoting 366.26, subd. (c)(1).) In assessing adoptability,

---

[14] Father did not raise any issue pertaining to adoptability at the hearing, but whether an adoptability finding is supported by substantial evidence may be raised for the first time on appeal. (See, e.g., *In re Gregory A*. (2005) 126 Cal.App.4th 1554, 1560; *In re Erik P*. (2002) 104 Cal.App.4th 395, 399.)

courts often describe minors who are likely to be easily placed due to their young age and good health as "generally adoptable" and those who might otherwise be difficult to place due to being older or having significant physical or mental handicaps as "specifically adoptable," indicating that a specific caretaker willing to adopt has been identified.  (See, e.g., *In re R.C.*, *supra*, 169 Cal.App.4th at pp. 492-494; *In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1409; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062.)  The juvenile court need not state on the record whether it found the child "'generally adoptable'" or "specifically adoptable"; we will affirm as long as clear and convincing evidence in the record establishes the likelihood that the dependent child will be adopted within a reasonable time.  (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

Here, all the children were young (under seven at the time of the section 366.26 hearing), physically healthy, and -- in the words of the caseworker -- "social and friendly."  Although S, Kylie, and Kayla had manifested emotional and/or developmental issues, more than one family had expressed an interest in adopting them.  Accordingly, the court reasonably could have found them to be generally adoptable.  (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225 [finding of adoptability of child with neurological and developmental problems supported where multiple families and one relative expressed interest in adoption]; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 [where even one family expresses willingness to adopt, general adoptability is supported].)

Moreover, the evidence clearly supported that they were specifically adoptable.  The A.'s had cared for two of the children since their detention in 2010 and Kayla since 2011.  By the time of the section 366.26 hearing, all five of the children had been living in their home for nine months.  The A.'s were intimately familiar with the children's developmental and emotional issues, but nevertheless assured the caseworker and the court at the time of the hearing that they were

committed to adopting them. They had briefly wavered months earlier because they mistakenly believed assistance in remedying the children's developmental and emotional problems would be withdrawn after the adoptions became final. Once that misconception was resolved, their enthusiasm for adoption returned. "[T]he existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. . . . [A] prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1312.)

Father contends the therapist's comments about the potential need to separate the children if they continued to behave aggressively toward each other cast doubt on the viability of the placement of all five children with the A.'s and therefore on whether some or all of the children were likely to be adopted. Preliminarily, we observe there is no requirement that a court considering the issue of adoptability in the context of terminating parental rights over multiple children find that the children are likely to be adopted in a single home as a sibling group. (*In re I.I.* (2008) 168 Cal.App.4th 857, 872, fn. 3.) When the children were in two separate foster homes, both sets of foster parents expressed interest in adopting them, supporting a finding that even if separated, the children were all likely to be adopted by someone. Moreover, the evidence presented did not demonstrate the children were likely to be separated or taken from the A.'s home. The therapist approved of the children's placement with the A.'s, as their foster mother showed "a lot of interest as well as support and encouragement in the children's academic and social activities" and "implement[ed] a very caring and structured discipline style." His comments about possible future separation were made during a

9

conversation with the caseworker and appeared to be based on speculation about what might happen if therapy and discipline proved to be ineffective. His speculation about future possibilities was undermined by the caseworker, who reported the children were building a solid relationship with each other and with the A.'s and were excited to live and play together. The A.'s themselves had reported being able to handle the children. The court could reasonably rely on this evidence to find that the children would likely remain with their prospective adoptive family, the A.'s. In short, substantial evidence supported the court's finding of adoptability.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.