Filed 10/31/23  In re P.T. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re P.T., a Person Coming Under the Juvenile Court Law. | B325094, B326409 (Los Angeles County Super. Ct. No. 19CJP04357) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TARA S., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Tara S. (mother) appeals from a juvenile court's post-judgment orders after the court concluded that mother's son, P.T., was a dependent under Welfare and Institutions Code section 300.[1] Mother contends the Los Angeles County Department of Children and Family Services (DCFS or the department) and the juvenile court failed to conduct the inquiry required by the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and the Welfare and Institutions Code. She further contends the court abused its discretion in denying her request for a continuance. We disagree with both contentions and thus affirm the order.

## BACKGROUND

### A. Dispositional Proceedings

On July 10, 2019, DCFS filed a petition under section 300 alleging dependency jurisdiction over P.T. after a sibling was found in a home where a police raid discovered a large amount of cocaine. DCFS contended P.T. was at risk of harm because mother had left the sibling with the child's godfather for weeks at a time, and the godfather was engaged in criminal drug activity while the sibling was there. In an amended petition, DCFS alleged mother and P.T.'s father (father) had a history of domestic violence. The court found the allegations to be true and assumed jurisdiction over the matter. At the conclusion of the

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

disposition hearing on October 10, 2019, the court declared P.T. a dependent, placed him with the paternal grandmother, and ordered mother to participate in reunification services consisting of a domestic violence support group, random drug testing, individual therapy, and monitored visits.

On February 23, 2022, the court held a 24-month review hearing, at the conclusion of which it found that mother had made no substantial progress toward alleviating the causes necessitating P.T.'s placement. The court terminated reunification services and scheduled a section 366.26 permanency hearing.

For the permanency hearing, the paternal grandmother reported there had been ongoing issues with mother, including mother being upset that the grandmother was unwilling to lie about the visitation. She was unwilling to monitor visits for mother after the case closed, and instead planned to pursue a restraining order. The grandmother did not believe anyone else would be willing to monitor visits.

Mother reported there were no friends or relatives who could monitor visits due to the distance to P.T.'s placement, and the maternal grandmother could not monitor visits outside of the home because she was older. Mother said she did not understand why "everything [was] put on [her]" to make a plan for monitored visits after the case closed, and said the case should not close without a plan in place. Mother wanted P.T. placed with the *maternal* grandmother so she could visit in the home. Mother said she could not afford a monitor, and stated she wanted the court to explore other options. Mother also wanted a halfway point for visits.

On November 15, 2022, the court held a section 366.26 hearing. DCFS and P.T.'s counsel both requested that the court terminate dependency jurisdiction with an order putting P.T. into legal guardianship with the paternal grandmother. They also requested that mother receive visits monitored by a paid provider.

Mother opposed legal guardianship on the ground that the paternal grandmother was an unsuitable guardian. She requested that the court retain jurisdiction, in part because she could not afford to pay a visitation monitor, and thus needed DCFS to continue monitoring visitation until some other solution was found or until she was granted unmonitored visits.

Mother also requested that the court continue the hearing for a couple weeks so she could find an appropriate monitor.

The court found that the paternal grandmother had provided appropriate care for the child and ordered legal guardianship with her as his permanent plan. The court found that mother's visitation issue was not an appropriate basis for continued jurisdiction, and therefore declined to retain jurisdiction.

The court found that mother refused to allow a babysitter to monitor visitation, and due to mother's past behavior there were no other willing monitors. Specifically, the paternal grandmother could not monitor due to an interpersonal conflict with mother and a stay-away order. The court stated, "The biggest issue that I see is that there is no other relative or individual the mother has proffered who can provide visitation at this time, and monitor on behalf of the mother."

The court asked if mother's counsel was aware of anyone who would be an appropriate monitor, and counsel responded

4

that mother had "people in her life who might be able to do it," such as her parents and "other friends and family members who might be able to do it," and said, "so I think that we should try to put in place another monitor."

The court found that reunification services had been terminated eight months before the current hearing, and mother still had no definitive information on any potential monitor despite ongoing discussions among the parties on the matter.

The court therefore denied a continuance on the ground that mother's inability to find an appropriate monitor was not good cause to delay P.T.'s permanency plan.

The court terminated jurisdiction and issued exit orders naming the paternal grandmother as P.T.'s legal guardian and granting mother visitation with a paid monitor.

## B. ICWA Proceedings

DCFS attached to its section 300 petition an "Indian Child Inquiry Attachment," California Judicial Council form ICWA-010(A), stating that an "Indian child inquiry [was] made." The social worker who filled out the form checked the box next to the words, "The child may have Indian ancestry," and noted on the form that "The mother reported the child might have Indian Ancestry[.]" In its July 10, 2019 report for the detention hearing, DCFS noted that mother had stated "[ICWA] may apply," that P.T. may be Cherokee, and that DCFS had been unable to contact father. On her "Parental Notification of Indian Status" form, California Judicial Council form ICWA-020, mother checked the box next to "I may have Indian ancestry" and wrote in "Blackfoot & Cherokee" next to "Name of tribe(s)." The record contains no ICWA-020 form for father.

5

Both mother and father appeared at the detention hearing, where mother again asserted that "she has American Indian ancestry Blackfoot and Cherokee," but that she was not a registered member of "either of those tribes." In response to the juvenile court's inquiry, mother stated she believed her great-grandfather, whom she identified as "George" and who was deceased, had been a registered member of a tribe. The juvenile court inquired whether mother "know[s] anyone in [her] family who might have more information regarding American Indian ancestry." Mother responded, "Not at the moment." The juvenile court then ordered DCFS "to do further investigation with the mother and any relatives regarding American Indian ancestry with those two tribes and notice to, well, the two Cherokee tribes and the Blackfoot tribe or tribes."

Father told the court P.T. may also have American Indian ancestry through his "great, great, great grandmother," Josephine R., but he did not know what tribe. When asked if he "kn[e]w anybody who might know any further information regarding Indian heritage," father responded, "I'll probably have to get back at you . . . ." On the record, the juvenile court deferred ICWA findings pending DCFS's inquiry. In its minute order regarding the hearing, the juvenile court stated, "The Court does not have a reason to know that ICWA applies as to Mother," "Department to do further investigation regarding ICWA," and "Tribes to be noticed."

DCFS detailed its ICWA inquiry status in a report to the juvenile court in advance of the jurisdiction and disposition hearing, scheduled for August 21, 2019. DCFS reported that it followed up with mother and father on July 23, 2019. Mother "confirmed her claim of having Native American [a]ncestry," but

6

"declined to provide further relative information." Father "confirmed his claim of having Native American [a]ncestry," "declined to provide further information, and denied knowing what tribe his relatives belonged to." On July 27, 2019, DCFS sent notice to "the Secretary of the Interior and the respective Cherokee and Blackfoot tribes via Certified Mail . . . ." Responses from both the Blackfeet Tribe and the Eastern Band of Cherokee Indians stated that Princeton was not eligible for enrollment and was not an "Indian Child" under ICWA. The record contains no responses from the other noticed entities.

After a hearing on August 21, 2019, the juvenile court entered a minute order stating: "The court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the [Bureau of Indian Affairs]. Parents are to keep [DCFS], their Attorney and the Court aware of any new information relating to possible ICWA status. ICWA-020, the Parental Notification of Indian Status is signed and filed."

At jurisdiction and disposition hearings in September and October 2019, the juvenile court sustained DCFS's petition as to both mother and father, ordered that P.T. continue to be detained from his parents, and ordered family reunification services. The only notation regarding ICWA in the minute order from the disposition hearing is "No ICWA."

Mother appealed this order, claiming that DCFS failed to conduct a reasonable investigation into P.T.'s Indian heritage.

We affirmed the order, holding that Indian ancestry or heritage is not the test for being an Indian child as defined in ICWA; to be an Indian child requires that the child be either a

member of a tribe or a biological child of a member. (*DCFS v. Tara S.* (*In re P.T.*) (July 23, 2020, B302043) [nonpub. opn.].)

At a section 366.26 hearing held on June 27, 2022, mother told the court that her great-aunt might have further information about possible Indian ancestry. The court ordered DCFS to contact the great-aunt, who said it was possible "George N.," her father, belonged to a Cherokee or Blackfeet tribe. The social worker subsequently mailed inquiry letters and followed up with emails to the Blackfeet and Cherokee tribes.

At a section 366.26 hearing on August 23, 2022, the court ordered the department to interview the paternal grandmother regarding the family's possible Indian ancestry.

Neither parent has ever indicated that she, he, or P.T. was a member or a biological child of a member of a tribe.

## DISCUSSION

### A. Continuance

Mother contends the juvenile court abused its discretion by denying her request for a continuance. We disagree.

Section 352 governs continuances in dependency proceedings. It provides that "[u]pon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held . . . ." Continuances are granted only upon a "showing of good cause," and only if it is not "contrary to the interest of the minor." (§ 352, subd. (a).) In considering the minor's interests, the court must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid.*)

8

A juvenile court exercises broad control over dependency proceedings (*In re Kelly D.* (2000) 82 Cal.App.4th 433, 439), and the decision to grant or deny a requested continuance is committed to that sound discretion (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1053). We will reverse a court's exercise of this discretion only upon a showing that it " 'exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Here, mother does not claim, and nothing in the record suggests, that delaying the permanency hearing would have made any material difference. The court terminated jurisdiction eight months prior to the permanency hearing, and in that time mother and DCFS had engaged in numerous conversations about visitation. Yet in all that time mother not only identified no viable candidate to monitor visitation, but also, she alienated potential monitors. Mother made no representation at the hearing that a monitor could in fact be identified. We therefore conclude the court acted within its discretion in denying a continuance to allow mother to find a monitor.

On appeal, mother makes no effort to identify any potential monitor nor representation of willingness to find one, but argues a continuance should have been granted to delay cessation of DCFS-monitored visits. She argues this would have had no impact on P.T.'s permanency plan because his placement with the paternal grandmother would not change.

In essence, mother argues the hearing should have been continued because a continuance would allow visitation to continue. But her finding a monitor would also have allowed

9

visitation to continue. The court acted well within its discretion in deciding that the need for prompt resolution of P.T.'s custody status and the need to provide him with a stable environment outweighed mother's need to avoid finding a visitation monitor.

**B.    ICWA**

Mother contends that after the previous appeal, "new information" provided by the maternal great-aunt gave a reason to believe that P.T. was an Indian child, which triggered a duty of further inquiry. She argues DCFS's failure to make further inquiry with extended family members was error. We disagree.

In the prior appeal, we held that the information DCFS possessed before the June 27, 2022 section 366.26 hearing gave rise to no further inquiry obligation. That holding is the law of the case. (See *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491 [" 'The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent . . . appeal in the same case' "].)

Nothing in the record suggests that after the prior appeal, DCFS became aware of new information spurring further inquiry duties.

Before the prior appeal, mother identified "George," her great-grandfather, as having possibly been a member of a tribe. After the prior appeal, mother's great-aunt identified "George N.," her father, as possibly having been a member. The record before us gives no indication that George and George N. were different individuals. Therefore, DCFS was under no obligation to make further ICWA inquiries.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED

                                        CHANEY, J.

We concur:


        ROTHSCHILD, P. J.


        BENDIX, J.