[No. S120903. Nov. 15, 2004.]

YOSHI MOROHOSHI et al., Plaintiffs and Appellants, v. PACIFIC HOME et al., Defendants and Respondents.

484

**COUNSEL**

Lange & Koncius, Joseph J. M. Lange and Jeffrey A. Koncius for Plaintiffs and Appellants.

Horvitz & Levy, David M. Axelrad, Frederic C. Cohen; Giovanniello & Michels, Alexander F. Giovanniello, Helen A. Michels and Cristian L. Peirano for Defendant and Respondent Harbor Regional Center.

Anahid Hoonanian and Daniel Juarez for Protection & Advocacy, Inc., and Capitol People First as Amici Curiae on behalf of Defendant and Respondent Harbor Regional Center.

Bill Lockyer, Attorney General, James M. Humes, Assistant Attorney General, Douglas M. Press and Susan M. Carson, Deputy Attorneys General, for Department of Developmental Services as Amicus Curiae on behalf of Defendant and Respondent Harbor Regional Center.

Reed Smith, Kathy M. Banke, Bette B. Epstein and Mary L. Perry for Association of Regional Center Agencies as Amicus Curiae on behalf of Defendant and Respondent Harbor Regional Center.

No appearance for Defendant and Respondent Pacific Home.

## Opinion

**BROWN, J.—** ■  Under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.[1]), care for the developmentally disabled is provided by private contractors operating, among other services, residential care facilities. The coordination of the delivery of such direct services is the responsibility of "private nonprofit community agencies" called "regional centers." (§ 4620, subd. (b).) This case involves the tragic death of a developmentally disabled individual resulting from the negligence of the staff of the residential care facility in which he had been placed by a regional center. Two questions are presented. (1) May the regional center be held vicariously liable for the negligence of the residential care facility? The Court of Appeal, in the second of its two opinions in this case, answered this question in the affirmative; we disagree. (2) Did the Court of Appeal's previous decision resolve the vicarious liability question, and is that decision controlling in this appeal under the law of the case doctrine? We conclude the Court of Appeal's previous decision did *not* resolve the vicarious liability question and, thus, is not controlling.

### I.   Factual and Procedural Background

Bobby Morohoshi, plaintiffs' adult son, was developmentally disabled; he was also an insulin-dependent diabetic. In 1995, Harbor Regional Center (Harbor) placed Bobby in Pacific Home, a residential care facility; Bobby resided there until his death in 1998.

Harbor arranged for nurses to visit Bobby twice a day to test his blood sugar and administer his insulin. Pacific Home's owner and her sister, who were registered nurses, originally performed this function. Later, this function was performed by home health nurses and other members of Pacific Home's staff.

In 1998, Pacific Home hired new staff, including Esther Sison. Sison was responsible for testing Bobby's blood-sugar level the night before he died. She failed to do so. The next morning Bobby lay dead in his bedroom.

Prior to trial, the Morohoshis moved in limine for an order preventing Harbor from contending the fault for Bobby's death "may or should be apportioned" between Harbor and Pacific Home. They based their motion on their contention Harbor was vicariously liable for any negligence by Pacific Home in providing care to Bobby. The trial court denied the motion. Harbor moved in limine for an order prohibiting the Morohoshis from presenting any

---

[1] All further statutory references are to the Welfare and Institutions Code.

evidence or arguing Harbor could be held vicariously liable for Pacific Home's tortious conduct; Harbor contended it could only be held liable for failure to discharge "its own nondelegable statutory duties." The trial court granted this motion.

Later, in a discussion of the special verdict form, the trial court repeated its view Harbor could not be held vicariously liable for Pacific Home's negligence and required the parties to draft a verdict form that would allow the jury to apportion negligence.

The jury found Pacific Home liable for Bobby's death on the basis of negligence and found it guilty of abuse of a dependent adult. The verdict awarded the Morohoshis economic damages of $5,644.36 and noneconomic damages in the amount of $600,000.[2] The jury found Harbor not negligent and awarded no damages against it.[3]

On appeal by the Morohoshis, the Court of Appeal ordered the judgment modified "to provide Harbor[] and Pacific Home are jointly and severally liable to the Morohoshis for the economic and noneconomic damages sustained as a result of Pacific Home's negligence in the sum of $505,644.36 plus costs as provided by law." In all other respects, the judgment was affirmed. The Morohoshis were awarded their costs on appeal.

The Court of Appeal held "Harbor is vicariously liable to the Morohoshis for Pacific Home's negligence pursuant to its nondelegable duty of care to Bobby." In its view, the Court of Appeal had rendered the same holding in its previous decision in this case. Therefore, the Court of Appeal concluded, this appeal is governed by the law of the cáse doctrine.

We disagree; accordingly, we reverse the judgment of the Court of Appeal.

## II. Discussion

Under the Lanterman Act, the state contracts with a network of regional centers—"private nonprofit community agencies" (§ 4620, subd. (b))—in order "to provide fixed points of contact in the community for persons with developmental disabilities and their families, to the end that these persons may have access to the services and supports best suited to them throughout

---

[2] Counsel represented at oral argument that residential care facilities like Pacific Home are not required to carry liability insurance.

[3] This statement of the factual and procedural background is drawn from the opinion below. Neither party petitioned for rehearing to suggest the Court of Appeal omitted or misstated any material fact. (Cal. Rules of Court, rule 28(c)(2).)

their lifetime" (§ 4620, subd. (a)). Regional centers are responsible for determining through testing and evaluation whether an individual has a developmental disability.[4] (§§ 4642, 4643.) If a regional center determines that an individual has a developmental disability and is eligible for services, a "planning team," comprised of the individual with the disability, his or her parents or guardian, one or more regional center representatives, and any other person or entity invited to participate, draws up an individual program plan (IPP). (§§ 4512, subd. (j), 4646, subds. (c), (d).) The IPP must identify the developmentally disabled person's "goals, objectives, and [needed] services and supports," taking into account the individual needs and preferences of the person and his or her family. (§ 4646, subds. (a), (d).) The IPP must include a schedule of the "type and amount of services and supports to be purchased by the regional center or obtained from generic agencies or other resources" in order to achieve the IPP's goals and objectives. (§ 4646.5, subd. (a)(4).)

The most important role of the regional centers is this "direct service coordination." (§ 4640.6, subd. (a).) "In approving regional center contracts, the [Department of Developmental Services] shall ensure that regional center staffing patterns demonstrate that direct service coordination [is] the highest priority." (Ibid.) The regional centers play this coordinating role by "assist-[ing] persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community." (§ 4640.7, subd. (a); see § 4648, subd. (a)(1).) The regional centers secure the needed services by "purchasing or by obtaining" them from direct service providers like Pacific Home. (§ 4647, subd. (a).) The process of identifying and qualifying the vendors or contractors from which services are purchased is known as "vendorization." (§ 4648, subd. (a)(3).)

The role played by regional centers in coordinating the delivery of the direct services indicated by a developmentally disabled person's IPP is clearly a vital one; indeed, the Legislature declared this coordinating role "is of such a special and unique nature that it cannot be satisfactorily provided by state agencies" (§ 4620, subd. (b)).

■ However, the Court of Appeal inflated Harbor's role in coordinating Bobby's care beyond all recognition by holding Harbor had a nondelegable duty to provide Bobby's care itself, or to closely monitor Pacific Home's provision of Bobby's care. A review of the applicable statutes and regulations reveals that (1) direct provision of care is not a responsibility of regional

---

[4] "Developmental disability" means a substantial disability that "originates before an individual attains age 18" and that can be expected to continue. (§ 4512, subd. (a).) The term includes mental retardation, cerebral palsy, epilepsy, and autism. (Ibid.)

centers; and (2) regional centers are not intended to monitor the care provided by their contractors on the day-by-day—indeed, hour-by-hour—basis that would have been required to prevent Bobby's tragic death.

### A. Direct Provision of Care Is Not a Responsibility of Regional Centers

The Court of Appeal mistakenly concluded that Harbor had authority to provide Bobby's care itself in lieu of contracting with a provider such as Pacific Home: "On its face, the Lanterman Act clearly imposes mandatory duties on Harbor to ensure the consumer receives proper care and services, whether or not Harbor chooses to 'vendorize' the actual placement."

■ To the contrary, the responsibility of a regional center is to "secure," not provide, care. (§ 4648, subd. (a)(1).) To read the list of services a regional center may be required to secure for a developmentally disabled individual is to understand that a regional center could not possibly be expected to provide those services itself.[5] Indeed, "except in emergency situations, a regional center shall not provide direct treatment and therapeutic services, but shall utilize appropriate public and private community agencies and service providers to obtain those services for its consumers." (§ 4648, subd. (f).)

■ As Harbor suggests, the Court of Appeal's conclusion that regional centers have the option of providing care themselves appears to have resulted from its having overlooked, through an unfortunate resort to ellipses, key language in section 4648, subdivision (a)(3). The Court of Appeal quoted the subdivision as follows: "A regional center *may*, pursuant to vendorization or a contract, purchase services or supports for a consumer . . . which the regional center . . . determines will best accomplish all or any part of that consumer's program plan." (Italics added.) When the language deleted in the first ellipsis

---

[5] The phrase "services and supports" refers to specialized services such as "diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, physical, occupational, and speech therapy, training, education, supported and sheltered employment, mental health services, recreation, counseling of the individual with a developmental disability and of his or her family, protective and other social and sociolegal services, information and referral services, follow-along services, adaptive equipment and supplies, advocacy assistance, including self-advocacy training, facilitation and peer advocates, assessment, assistance in locating a home, child care, behavior training and behavior modification programs, camping, community integration services, community support, daily living skills training, emergency and crisis intervention, facilitating circles of support, habilitation, homemaker services, infant stimulation programs, paid roommates, paid neighbors, respite, short-term out-of-home care, social skills training, specialized medical and dental care, supported living arrangements, technical and financial assistance, travel training, training for parents of children with developmental disabilities, training for parents with developmental disabilities, vouchers, and transportation services necessary to ensure delivery of services to persons with developmental disabilities." (§ 4512, subd. (b).)

is restored, it becomes clear the only choice facing regional centers, except in emergencies, is which vendor to hire, not whether to hire a vendor at all. "A regional center may, pursuant to vendorization or a contract, purchase services or supports for a consumer *from any individual or agency* which the regional center and consumer or, where appropriate, his or her parents, legal guardian, or conservator, or authorized representatives, determines will best accomplish all or any part of the consumer's program plan." (§ 4648, subd. (a)(3), italics added.)

### B. *Regional Centers Are Responsible for Only Periodic Monitoring*

■ Regional centers have important but limited monitoring responsibilities. A regional center representative is required to monitor the provision of care and services supplied by a provider to ensure they are provided in accordance with the developmentally disabled person's IPP. (§§ 4742, 4743.) During monitoring visits to a provider, the regional center liaison is required to, among other things, review staff schedules for compliance with the approved service level requirements, review staff personnel files to ensure compliance with the regulations pertaining to training and testing, and select and review a randomly chosen sample of *20 percent* of the facility's records to ensure that services are being provided to the developmentally disabled persons in accordance with their IPP's. (Cal. Code Regs., tit. 17, § 56048, subd. (d).) The regional center liaison must inform the administrator of the facility of any substantial inadequacies found in the care and services provided, the specific corrective actions necessary, and the date by which those actions must be completed. (§ 4745.) A regional center may terminate its contract with a provider if it determines the provider has not complied with the contract or with applicable law and regulations. (§ 4648.1, subd. (d).) If conditions constituting an immediate danger to a developmentally disabled person come to the attention of a regional center, the regional center must investigate the situation immediately, and if the immediate danger cannot be corrected within 24 hours of verification, the regional center must take immediate steps to relocate the developmentally disabled person. (Cal. Code Regs., tit. 17, § 56053.)

■ However, the Legislature did not require of regional centers anything like the hour-by-hour monitoring that would have been required to prevent Bobby's tragic death. A regional center is required to establish a "schedule of regular *periodic* review and reevaluation to ascertain that planned services have been provided, that objectives have been fulfilled within the times specified, and that consumers and families are satisfied with the individual program plan and its implementation." (§ 4646.5, subd. (a)(6), italics added.) A regional center representative must meet with a developmentally disabled person at least *quarterly* to review progress towards achieving the IPP

objectives. (Cal. Code Regs., tit. 17, § 56047, subd. (a).) No fewer than *two* unannounced monitoring visits to a care facility are to be conducted by a regional center each year. (§ 4648.1, subd. (a).) The regional center liaison is required to visit the facility at least *once* a year. (Cal. Code Regs., tit. 17, § 56048, subd. (d)(1).) A service coordinator may be responsible for monitoring dozens of consumers.[6] Stretched so thin, the service coordinators could not possibly provide the continuous monitoring contemplated by the Court of Appeal.

### C. *The Doctrine of the Law of the Case Does Not Apply Here*

Plaintiffs contend, and the Court of Appeal agreed, this appeal is governed by the law of the case doctrine; this would preclude Harbor from taking issue with the Court of Appeal's holding in this appeal, which for purposes of this discussion we will refer to as *Morohoshi II,* that "Harbor was vicariously liable under the rationale of nondelegable duty for any negligence on the part of Pacific Home."

"The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal:* The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.)

The law of the case doctrine applies to this court even though the previous appeal was before the Court of Appeal, and it applies even though this court may conclude the previous Court of Appeal opinion was erroneous. (*People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481].) "Indeed, it is only when the former rule is deemed erroneous that the doctrine of the law of the case becomes at all important." (*Tally v. Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049].) The doctrine is, we have recognized, harsh. (*Clemente v. State of California* (1985) 40 Cal.3d 202, 212 [219 Cal.Rptr. 445, 707 P.2d 818].) Accordingly, we have declined to adhere to it where its application would result in an unjust decision, e.g., where there has been a manifest misapplication of existing principles resulting in substantial

---

[6] Section 4640.6, subdivision (c) states in part: "Contracts between the department and regional centers shall require regional centers to have service coordinator-to-consumer ratios, as follows: [¶] (1) An average service coordinator-to-consumer ratio of 1 to 62 for all consumers who have not moved from the developmental centers to the community since April 14, 1993. In no case shall a service coordinator for these consumers have an assigned caseload in excess of 79 consumers for more than 60 days. [¶] (2) An average service coordinator-to-consumer ratio of 1 to 45 for all consumers who have moved from a developmental center to the community since April 14, 1993. In no case shall a service coordinator for these consumers have an assigned caseload in excess of 59 consumers for more than 60 days."

injustice, or where the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination. (*Stanley*, at p. 787.)

In invoking the law of the case doctrine in *Morohoshi II*, the Court of Appeal misread its prior decision. The holding of *Morohoshi II*, that "the trial court erred in refusing to allow the jury to find defendant vicariously liable for Bobby's death caused by the negligence of defendant's agent Pacific Home," was simply not a ground of the decision in *Morohoshi I*. Therefore, since the law of the case doctrine is itself inapplicable here, we need not address the applicability of exceptions to it.

In *Morohoshi v. Pacific Home* (Aug. 21, 2001, B143379) [nonpub. opn.] (*Morohoshi I*), Harbor moved for summary judgment, the trial court granted the motion, and the Morohoshis appealed the dismissal of their action as to Harbor. The Court of Appeal reversed, holding the Morohoshis had presented evidence of multiple triable issues of material fact as to Harbor's breach of duties imposed on regional centers by the Lanterman Act.

However, in *Morohoshi II*, the Court of Appeal gave this description of its holding in *Morohoshi I*: "In *Morohoshi I* we recognized Harbor could be held liable for its own negligence toward Bobby *but we also specifically held Harbor was vicariously liable under the rationale of nondelegable duty for any negligence on the part of Pacific Home*." (Fns. omitted.) "The nondelegable duty rule," the *Morohoshi II* court noted, "is a form of vicarious liability. [Citations.]"

The opinion in *Morohoshi I* is 22 pages long. The "Discussion" portion of the opinion is 14 pages long. The passage in *Morohoshi I* that is cited in *Morohoshi II* appears on page 17 of the previous opinion. This passage, which is entitled "HRC [7] Could Not Delegate To Pacific Home the Duties It Owed To Decedent," is only eight lines long. In full, it reads: "HRC contends it did not have a nondelegable duty to decedent because the statutory scheme does not envision it. HRC relies on *Privette v. Superior Court* [(1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721]]; however, *Privette* contains no such holding. [¶] As a matter of law, HRC's duties could not be delegated to Pacific Home. HRC's duties under sections 4647, 4648, and 4742 are found in Article Two of the Lanterman Act which is entitled, '*Regional Center Responsibilities*.' The Legislature's intent is clear and unambiguous. The

---

[7] In *Morohoshi I*, the Court of Appeal referred to Harbor as HRC.

language [*sic*][8] of the statutes in Article Two are imposed solely on regional centers as evidenced by the language of sections 4647, 4648, and 4742."

As Harbor contends, the Court of Appeal in *Morohoshi I* "did not analyze the issue of 'vicarious liability' and it did not hint that Harbor Regional Center could be liable for *Pacific Home's* own negligence." To the contrary, the passage in question speaks only of "HRC's duties." The duties mentioned, the court stressed, "are found in Article Two of the Lanterman Act which is entitled, '*Regional Center* Responsibilities.' " The duties arising under article 2, the court reiterated, "are imposed solely on regional centers as evidenced by the language of sections 4647, 4648, and 4742."[9] As Harbor points out, the Court of Appeal in *Morohoshi I* "never suggested Harbor could be liable, even if it fulfilled its obligations under these statutes (as the jury concluded it had), simply because Pacific breached its independent duty of care."

## DISPOSITION

The judgment of the Court of Appeal is reversed and remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

---

[8] Presumably, the Court of Appeal intended to say "duties," not "language."

[9] Very briefly, the duties imposed upon regional centers by the cited sections include the following: coordinating the services necessary to implement a developmentally disabled person's IPP (§ 4647); securing needed services, advocating for clients, building support in the community, and increasing the quality of services (§ 4648); and counseling facility staff regarding the care and services required by clients, and monitoring the care and services to assure they are provided in accordance with the IPP (§ 4742).