Filed 2/22/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALI SHALGHOUN, | B323186 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV19756) |
| v. | |
| NORTH LOS ANGELES COUNTY REGIONAL CENTER, INC., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Respondent. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 25, 2024, be modified as follows:

1. After the last sentence of footnote 2 on page 5, which ends "resolved by March 2018," add the following sentences to the end of the footnote:

At oral argument and in a petition for rehearing, plaintiff repeatedly cites this report as evidence that Hargis Home was not providing J.C. with an "appropriate level of care" vis-à-vis his physical outbursts. This is a blatant misrepresentation of the record.

2. On page 10, line 18, after the citation ending "[regional centers do not engage in 'hour-by-hour monitoring'].),'" add as footnote 4 the following footnote, which will require renumbering of all subsequent footnotes:

> 4    For the first time in his petition for rehearing, plaintiff relies on information on a website in urging us to disagree with our Supreme Court's characterization of the extensiveness of monitoring by regional centers. New evidence may not be presented on appeal, let alone for the first time in a petition for rehearing. What is more, the information plaintiff quotes from the website merely confirms what we have set forth in this opinion.

3. On page 19, line 17, after the sentence ending "had a practice of doing so for J.C. in the past," add the following sentences:

> In his petition for rehearing, plaintiff for the first time offered up section 4648, subdivisions (a)(10)(A) and (f), as well as section 4698 as statutes empowering such unilateral relocation. These statutes are inapt. Subdivision (a)(10)(A) of section 4648 authorizes a regional center—either "directly or

through an agency acting on [its] behalf"—to place a consumer in a "health care facilit[y]" (or a "foster family" or other residential facility), but does not empower a regional center to do so unilaterally and over that facility's (or family's) objection; subdivision (f) of section 4648 deals with a regional center's power to "provide direct *treatment and therapeutic services*" in "emergency situations" (italics added), but does not empower a regional center to directly and unilaterally house a consumer; and section 4698 deals with the certification and oversight of "community crisis homes," but again does not empower a regional center to place a consumer into such a home over the home's objection.

4. On page 22, line 21, after the sentence ending "into the consumer's orbit," add as footnote 9 the following footnote, which will require renumbering of all subsequent footnotes:

> **9** The Regional Center's acknowledgment, in its July 6, 2018 progress report, that it had secured funding for additional staff "to keep [J.C.] *and staff safe*" (italics added) does not, contrary to what plaintiff argues in his petition for rehearing, establish a duty running from the Regional Center to staff. The question of duty is a question of law for the courts.

5. On page 27, line 2, after the sentence ending "namely, workers' compensation," add the following sentence:

3

Plaintiff complains that the workers' compensation system does not provide for full recovery, but that only illuminates the true motivation of this action and demonstrates why recognizing the duty plaintiff urges would be devastating to regional centers.

6. In line 3 of the first full paragraph on page 27, after the sentence ending "is able to obtain insurance," add as footnote 10 the following footnote:

> 10      For the first time in his petition for rehearing and once again pointing us to a website to provide additional evidence never presented before, plaintiff argues that Hargis Home was required to name the Regional Center as an additional insured on *Hargis Home*'s insurance policy.  But an insurance company's willingness to ensure a regional center on the basis of the limited liability that exists today does not speak to whether insurance would be available for the open-ended liability that would exist if we recognized the duty plaintiff proposes.

\* \* \*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

ASHMANN-GERST, Acting P. J.  CHAVEZ, J.  HOFFSTADT, J.

4

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALI SHALGHOUN, | B323186 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV19756) |
| v. | |
| NORTH LOS ANGELES COUNTY REGIONAL CENTER, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Young, Judge. Affirmed.

Doumanian & Associates, Nancy P. Doumanian; The Arkin Law Firm and Sharon J. Arkin for Plaintiff and Appellant.

Beach Law Group, Thomas E. Beach and Darryl C. Hottinger for Defendant and Respondent.

* * * * * *

In the Lanterman Developmental Disabilities Services Act (the Lanterman Act or the Act) (Welf. & Inst. Code, § 4500 et seq.),[1] the State of California has undertaken the duty to provide developmentally disabled persons with appropriately tailored services and support.  To discharge this duty, the Department of Developmental Services (the Department) uses a network of private, nonprofit entities called "regional centers."  (§ 4620.)  Regional centers do not themselves provide services; instead, they evaluate the developmentally disabled persons (whom the Act calls "consumers"), develop individually tailored plans for their care, enter into contracts with direct service providers to provide the services and support set forth in the plans, and monitor the implementation of those contracts and the consumers' plans.  (§§ 4642, 4643, 4640.6, subd. (a), 4647, 4648, 4648.1, 4742, 4743.)  In this case, a regional center arranged for a developmentally disabled person to be placed in a residential facility, the facility thereafter informed the regional center that it could no longer provide the level of care the person required, and the person—while the regional center was in the midst of lining up a different facility—attacked and injured the facility's administrator.  The administrator sued the regional center for his injuries.  His lawsuit presents the following question:  Does a regional center have a duty to protect the employees of a residential facility that accepted a developmentally disabled person as a resident when the regional center does not immediately relocate that person as requested by the facility?

---

1      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

We conclude that the answer is "no," and accordingly affirm the trial court's grant of summary judgment for the regional center.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *J.C. and his history*

J.C. is a man in his early thirties with a "mild intellectual disability" along with autism, an "unspecified" "non-psychotic mental disorder," a "generalized anxiety disorder," and "obsessive compulsive disorder." J.C. engages in self-harming behavior and also has "outbursts of physical violence and aggression" toward others.

J.C. is a client of the North Los Angeles County Regional Center, Inc. (the Regional Center). The Regional Center developed an individual program plan for J.C., which includes housing him at a residential facility.

Between April 2008 and April 2016, the Regional Center arranged for J.C. to be housed at the Fairview Developmental Center, a residential facility for developmentally disabled persons. While there, J.C. exhibited "dangerous propensities to hurt himself and others."

#### B. *Placement in Hargis Home*

On April 21, 2016, J.C. moved into Hargis Home, a licensed adult residential facility owned by People's Care Los Angeles, LLC. Hargis Home is rated as being able to provide the "highest level" of care for developmentally disabled persons and can accommodate a total of three residents.

The Regional Center had "suggest[ed]" Hargis Home as a possible placement for J.C. after Fairview Developmental Center, but Hargis Home independently conducted its own assessment of whether it could accommodate J.C. given his level of disability.

3

After determining that J.C. was "compatible with other [r]esidents" of the facility as well as Hargis Home's "program design and service level," Hargis Home signed a contract with the Regional Center accepting J.C. as a resident. In that contract, Hargis Home affirmed that the Regional Center had "provided all available information concerning [J.C.'s] history of dangerous behavior."

The Regional Center contracted with My Life Foundation, Inc. to provide additional staff to attend to J.C. when J.C. would leave Hargis Home on outings.

**C.** *Plaintiff becomes the administrator of Hargis Home, and has concerns about its ability to care for J.C.*

Ali Shalghoun (plaintiff) became the administrator of Hargis Home in November 2017. Despite being hired as the facility's administrator, plaintiff alternatively asserted that he had no idea that any of the facility's residents exhibited "aggressive or violent behavior," that he "w[as]n't clear" about the residents' behavior and the corresponding level of care Hargis Home offered, and that he *did know* that the residents exhibited such behavior but did not know "the *level* of the aggression." (Italics added.)

Despite Hargis Home's initial determination and representation that it could accommodate J.C.'s level of disability, plaintiff felt that its staff was "not trained sufficiently" to handle J.C. Plaintiff did not act on his concerns until much later.[2]

_____

[2] In a January 2018 interim report, the Regional Center noted that Hargis Home was not "address[ing]" J.C.'s "developmental needs and the type and intensity of care required" because the staff were not feeding him food that

4

In February 2018, J.C. had an encounter with plaintiff in which J.C. smeared feces and ripped plaintiff's clothes.

In April 2018, J.C. assaulted plaintiff and was restrained.

In May 2018, J.C. again assaulted plaintiff by "bec[oming] aggressive towards [p]laintiff when [p]laintiff told him of [an] upcoming appointment."

**D.** *Hargis Home sends the Regional Center a letter requesting that J.C. be moved to a different facility*

On May 16, 2018, Hargis Home sent the Regional Center a letter. In that letter, Hargis Home stated its view that J.C. has "intensive needs," that "his needs exceed [Hargis Home's] design mandate," and that this mismatch "places [J.C.] and the other residents at risk for injury." Hargis Home was thus "issuing a 30-day notice" to the Regional Center, and "request[ing] help . . . in finding alternative placement" for J.C. and "extra direct care staffing hours to support [J.C.] 24/7."

In May or June 2018, Hargis Home also initiated eviction proceedings against J.C.

**E.** *The Regional Center takes action*

The Regional Center began a statewide search for a new facility to house J.C. By July 6, 2018, it had asked five different residential facilities if they could accommodate J.C.; all had declined. But the Regional Center continued its search.

In the meantime, the Regional Center secured additional funding for additional staffing "in order to keep [J.C.] and staff [at Hargis Home] safe."

---

accounted for his obesity. This issue was resolved by March 2018.

5

### F. *J.C. attacks and seriously injures plaintiff*

On July 27, 2018, J.C. approached plaintiff as plaintiff worked at a desk on the premises of Hargis Home. J.C.—who is around 5 feet 8 inches tall and weighs 265 pounds—picked up plaintiff and threw him backwards against an overhead cabinet. Plaintiff's head struck the cabinet. Plaintiff suffered a laceration to his head, a "mild concussion" with attendant tinnitus and dizziness, pain in his neck and shoulder, and lost a tooth.

Plaintiff pursued and obtained a workers' compensation award from People's Care Los Angeles, LLC.

## II. Procedural Background

On June 6, 2019, plaintiff sued the Regional Center for his injuries on two theories—namely, (1) vicarious liability for the negligence of its employees (Gov. Code, § 815.2); and (2) failure to satisfy its mandatory duties to monitor Hargis Home (Gov. Code, § 815.6).[3]

In March 2022, the Regional Center moved for summary judgment on the grounds, as pertinent here, that (1) it owed plaintiff no legal duty, and (2) plaintiff had assumed the risk of the types of injuries caused by J.C. by accepting a job at Hargis Home. After full briefing and a hearing, the trial court granted the Regional Center's motion on the first ground. Specifically, the court reasoned that the Regional Center "only owed duties to [J.C.], and not to [p]laintiff," and that this result accords with the

---

[3] Plaintiff also sued the County of Los Angeles, the Los Angeles County Department of Mental Health, My Life Foundation, Inc., and five of the Regional Center's employees. Plaintiff subsequently dismissed the County of Los Angeles and My Life Foundation, Inc. The only defendant pertinent to this appeal is the Regional Center.

purpose of the Act because regional centers "should be concerned with providing adequate resources to consumers for the consumer's sake, not for potentially unknown third-party employees of a residential facility."

After judgment was entered, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in granting summary judgment to the Regional Center on the ground that the Regional Center did not owe him a duty of care.

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); Code Civ. Proc., § 437c, subd. (c).) To prevail on such a motion, the moving party—here, the Regional Center—must show that the plaintiff "has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500.) In evaluating whether the Regional Center made this showing, we liberally construe the evidence before the trial court in support of the party opposing summary judgment and resolve all doubts concerning that evidence in support of that party. (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) We independently review the grant of summary judgment as well as any subsidiary legal questions, such as whether a duty of care or special relationship exists. (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087 [summary judgment]; *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*) [duty of care]; *Regents*, at p. 620 [special relationship].)

7

## I.    The Lanterman Act

Pursuant to the Lanterman Act, our state has undertaken the duty to provide "[a]n array of services and supports" to "person[s] with developmental disabilities." (§ 4501; see also § 4512, subd. (a)(1) [defining "developmental disability"]; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 388-389.)  The Act labels those persons "consumers." (E.g., § 4640.7 et seq.; Cal. Code Regs., tit. 17, § 56002, subd. (a)(5).)

The Department oversees the provision of services and support to those consumers. (§ 4416.)  However, because those services and support "cannot be satisfactorily provided by state agencies," the Act requires the Department to do so by contracting with "regional centers," which are "private nonprofit community agencies" that operate as "fixed points of contact in the community" to diagnose, counsel and coordinate the acquisition of the necessary services and support. (§§ 4501, 4620, 4621, 4640.6, subd. (a), 4640.7, subd. (a); Cal. Code Regs., tit. 17, § 56002, subd. (a)(36); *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 486-488 (*Morohoshi*); *In re Williams* (2014) 228 Cal.App.4th 989, 996, fn. 2.)

More specifically, regional centers are tasked with the following:

● *Diagnosis and counseling.*  Regional centers must evaluate whether a particular individual suffers from a "developmental disability." (§§ 4642, 4643.)  If so, the regional center must assess their needs and formulate an "individual program plan" (or IPP) that delineates each consumer's "goals, objectives, and [needed] services and supports." (§§ 4646, 4512,

8

4646.5, subd. (a); *Morohoshi*, *supra*, 34 Cal.4th at pp. 487-488; Cal. Code Regs., tit. 17, § 56022, subd. (b).)

●　　*Coordinating the provision of services and support*. Regional centers do not *themselves* directly provide any services or support to consumers.  (§ 4648, subd. (a)(1); *Morohoshi*, *supra*, 34 Cal.4th at p. 489 ["the responsibility of a regional center is to 'secure,' not provide, care"].)  Instead, they *coordinate* the provision of services and support by entering into contracts with "direct service providers"—that is, the entities who actually provide residential facilities, counseling or other services and support that the consumers need.  (§§ 4640.6, subd. (a), 4647, 4648; *Morohoshi*, at p. 488.)  When it comes to placing a consumer in a residential facility, the regional center *suggests or recommends* where a consumer may be placed, but it is up to the residential facility whether to accept the consumer as a resident. (Cal. Code Regs., tit. 17, § 56016, subd. (c); Cal. Code Regs., tit. 22, § 85068.4, subd. (a).)  A central goal of the Act is to place consumers in the "least restrictive environment" that can manage their specific developmental disability, as doing so enables those consumers to "achieve[] . . . the most independent, productive, and normal lives possible."  (§ 4502, subd. (b)(1); § 4648, subd. (a)(1) ["highest preference" should be given "to those services and supports that would allow . . . adult persons with developmental disabilities to live as independently as possible in the community"].)

●　　*Monitoring the provision of services.*  Regional centers are tasked with monitoring, on a going-forward basis, whether the services and support they have arranged are in accord with the consumer's IPP.  (§§ 4742, 4743; Cal. Code Regs., tit. 17, § 56047, subd. (a) [requiring "quarterly" meetings regarding

9

progress under IPP]; *Morohoshi, supra*, 34 Cal.4th at p. 490 ["Regional centers have important but limited monitoring responsibilities"].) When a regional center places a consumer in a residential facility, the center is also tasked with monitoring whether the facility remains safe for the consumer, informing the facility of any deficiencies, and terminating the center's contract with the facility if those deficiencies are not remedied or, if there is an immediate danger to the consumer, taking immediate steps to relocate the consumer. (§ 4648.1; Cal. Code Regs., tit. 17, §§ 56048, subd. (d), 56053.) The Act obligates a regional center to audit facilities and to conduct "periodic" (that is, annual or semi-annual) visits; a center does not engage in strict, "hour-by-hour" oversight. (§ 4648.1, subd. (a) [minimum of "two monitor[ed]" and "unannounced" visits per year]; Cal. Code Regs., tit. 17, §§ 56047, subd. (a) [quarterly meeting regarding IPP may occur at facility], 56048, subd. (d)(1) [facility liaison must conduct one monitoring visit per year]; *Morohoshi*, at pp. 490-491 [regional centers do not engage in "hour-by-hour monitoring"].) A consumer may ask the regional center that they be relocated to a new residential placement, which obligates the regional center to "schedule an individual program plan meeting . . . to assist in locating and moving to another residence." (§ 4747; Cal. Code Regs., tit. 17, § 56017, subd. (a).) A facility that "determines that [it] can no longer meet the needs of [a] consumer" may ask the regional center to "assist[]" in relocating the consumer; upon receiving this request, the regional center (1) "shall relocate the consumer within 30 days or within" a "mutually agreed-upon" "time frame"; and (2) must provide "[a]ny additional measures necessary to meet *the consumer's* health and safety needs until the relocation has been accomplished." (Cal. Code Regs., tit. 17, §

10

56016, subds. (e), (b), (f) & (g), italics added.)  Residential facilities independently have the power to evict a consumer, with either 30 days' or three days' notice; as pertinent here, a residential facility may evict a consumer if he "has engaged or is engaging in behavior which is a threat to his/her mental and/or physical health or safety, or to the health and safety of others in the facility."  (Cal. Code Regs., tit. 22, § 85068.5.)

●      *Coordinating funding*.  Regional centers are funded by the state (§§ 4620, 4621, 4629), but are obligated also to seek funding from other sources (§ 4659).

## II.    Analysis

Plaintiff's two claims against the Regional Center are both grounded in negligence.  A plaintiff can prevail on a negligence claim only if he establishes, as a "threshold matter," that *the particular defendant he is suing* owes him a "legal duty of care." (*Brown*, *supra*, 11 Cal.5th at pp. 213, 209.)

### A.    *Legal duties of care, generally*

Whether a particular defendant owes a particular plaintiff a legal duty of care (actionable in a claim for negligence) is, at bottom, a "question of public policy"—namely, *should* that plaintiff's interests be entitled to legal protection against the defendant's conduct?  (*Regents*, *supra*, 4 Cal.5th at pp. 627-628; *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*); *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*).)

As our Supreme Court clarified in *Brown*, *supra*, 11 Cal.5th at pp. 209, 218-219, answering that question obligates us to ask two further questions:  (1) Does the defendant owe the plaintiff a legal duty of care under traditional principles of tort law, and if so, (2) do the relevant public policy considerations set forth in

11

*Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) nevertheless favor "limiting that duty"?

             1.    *Duty, under traditional principles of tort law*

California tort law rests on two general rules governing legal duties of care.

The first rule is that a person has a legal duty to act reasonably and with due care under the circumstances *with respect to their own actions*. (Civ. Code, § 1714, subd. (a); *Kuciemba, supra,* 14 Cal.5th at p. 1016; *Brown, supra,* 11 Cal.5th at pp. 213-214; *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398 (*Gas Leak Cases*); *Regents, supra,* 4 Cal.5th at p. 619; *Kesner, supra,* 1 Cal.5th at pp. 1142-1143; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) In this situation, liability for breach of this duty rests upon that person's *affirmative conduct*; as a result, the duty itself is grounded in *misfeasance*.[4] (*Lugtu v. California Highway Patrol* (2001) 26

---

[4] Plaintiff has abandoned his prior theory that the Regional Center is liable in negligence for its affirmative conduct (and hence misfeasance) in suggesting that J.C. be housed at Hargis Home. This theory is foreclosed as a matter of law in any event because it is undisputed that Hargis Home independently evaluated J.C.'s fitness for its facility, so it did not rely on the Regional Center's initial "suggestion" for placement. As a result, the Regional Center did not engage in any misfeasance that caused Hargis Home's employees to be placed in peril. (Cf. *Regents, supra,* 4 Cal.5th at p. 619; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128 (*Zelig*); *MacDonald v. California* (1991) 230 Cal.App.3d 319, 334; *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 533.)

Plaintiff has also abandoned his prior (and somewhat related) theory that the Regional Center created a peril by failing to warn him of J.C.'s violent propensities. This theory is also

12

Cal.4th 703, 716 (*Lugtu*) ["'[m]isfeasance exists when the *defendant* is responsible for making the plaintiff's position worse"], italics added.)

The second rule is that a person has *no* legal duty to protect others from a *third party's* conduct. (*Regents*, *supra*, 4 Cal.5th at pp. 619, 627; *Zelig*, *supra*, 27 Cal.4th at p. 1129; *Williams v. State of California* (1983) 34 Cal.3d 18, 23; *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49.) Liability for breach of this duty would rest upon that person's *failure to take action to protect the plaintiff*; as a result, any duty would be grounded in *nonfeasance*. (*Lugtu*, *supra*, 26 Cal.4th at p. 716 ["'nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention'"]; *Brown*, *supra*, 11 Cal.5th at pp. 214-215.)

This second, no-duty-to-protect rule is not without exception, although the exception pertinent to this case is a narrow one. Unlike the legal duty not to engage in *misfeasance*, which runs to *anyone whose injuries are proximately caused by a breach of that duty*, a legal duty not to engage in *nonfeasance* is actionable only if the person being sued (the defendant) (1) has a "special relationship" with a specific individual; and (2) that special relationship gives rise to a legal duty of care running *to the plaintiff* (or, more broadly, *to the class of persons to which the plaintiff belongs*). (*Zelig*, *supra*, 27 Cal.4th at p. 1129; *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203; *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435,

---

foreclosed as a matter of law in any event because the undisputed facts establish that Hargis Home *was* fully informed of J.C.'s violent propensities. Thus, plaintiff's citation to *Johnson v. State of California* (1968) 69 Cal.2d 782—a case dealing with failure to warn—is inapt.

superseded on other grounds by Civ. Code § 43.92; *Gas Leak Cases*, *supra*, 7 Cal.5th at pp. 397-398 [defendant must owe a duty to "'"an interest of [the plaintiff]"'"]; *Brown*, *supra*, 11 Cal.5th at p. 213 [same]; *Musgrove v. Silver* (2022) 82 Cal.App.5th 694, 706 (*Musgrove*); *Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 931 (*Issakhani*); *Regents*, *supra*, 4 Cal.5th at p. 621 ["a special relationship is limited to specific individuals"].)  More specifically, a defendant may be liable to a plaintiff for the defendant's nonfeasance in the following two scenarios:

●      *When the defendant has a special relationship with the third party who causes harm.*  A defendant owes a legal duty of care to the plaintiff *if* (1) the defendant has a "special relationship" with a third party who injures the plaintiff, and (2) that special relationship entails a duty to control the third party's conduct for the benefit of the plaintiff or the class of persons to which the plaintiff belongs.  (*Regents*, *supra*, 4 Cal.5th at p. 619.)  With regard to the second element, a duty to control presupposes an *ability* to control "such that 'if exercised, [it] would meaningfully reduce the risk of the harm that actually occurred.'"  (*Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 78; *Megeff v. Doland* (1981) 123 Cal.App.3d 251, 261; *Smith v. Freund* (2011) 192 Cal.App.4th 466, 473; *Wise v. Superior Court* (1990) 222 Cal.App.3d 1008, 1013-1014.)  The ability (and hence concomitant duty) to control may be anchored in (1) control imparted by virtue of the nature of the relationship itself (as is the case with a parent-child or employer-employee relationship) (*Kesner*, *supra*, 1 Cal.5th at p. 1148; *Musgrove*, *supra*, 82 Cal.App.5th at p. 711; *McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 484-

14

485); or (2) control imparted by virtue of control over "the environment" where the plaintiff is injured (as is the case with schools being able to control students on campus) (*Regents*, *supra*, 4 Cal.5th at pp. 631-632; *Wise*, at p. 1013).

●    *When the defendant has a special relationship with the plaintiff.*  A defendant owes a legal duty of care to the plaintiff *if* the defendant has a "special relationship" with the plaintiff grounded in the defendant's "superior control over the means of protect[ing]" the plaintiff (and the plaintiff's concomitant "dependency" on that protection).  (*Regents*, *supra*, 4 Cal.5th at pp. 619-621.)  This type of special relationship exists between a common carrier and its passengers, an innkeeper and its guests, a jailer and its prisoners, and an employer and its employee(s); in each instance, the former has superior control over the means of protecting the latter that creates a duty to protect that runs to the plaintiff.  (*Regents*, at p. 621; *Brown*, *supra*, 11 Cal.5th at p. 216; *Musgrove*, *supra*, 82 Cal.App.5th at p. 711.)

2.    *Public policy considerations that may counsel in favor of limiting the duty*

Even if California law provides that a legal duty of care runs between a plaintiff and a defendant, courts have the power and obligation to examine whether considerations of public policy warrant limiting that duty.  (*Brown*, *supra*, 11 Cal.5th at p. 217; *Regents*, *supra*, 4 Cal.5th at pp. 628-629; *Gas Leak Cases*, *supra*, 7 Cal.5th at pp. 398-399; *Cabral*, *supra*, 51 Cal.4th at p. 772.)  This public policy analysis is "forward-looking" and to be conducted on a general, categorical basis (*Kesner*, *supra*, 1 Cal.5th at p. 1152; *Kuciemba*, *supra*, 14 Cal.5th at p. 1022); in

15

effect, we ask:  Does public policy warrant curtailing liability in a particular *category* of cases in the future?

Our Supreme Court in *Rowland* outlined the pertinent public policy considerations.  They fall into two categories.

The first category examines the foreseeability of the plaintiff's injury.  *Rowland* identifies three foreseeability considerations:  (1) whether ""'the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed'""; (2) the degree of certainty that the plaintiff suffered injury; and (3) the closeness of the connection "'between the defendant's conduct and the injury suffered.'"  (*Regents*, *supra*, 4 Cal.5th at pp. 629-630.)

Although these foreseeability factors are "'[t]he most important'" (*Regents*, *supra*, 4 Cal.5th at p. 629), foreseeability is not dispositive of the policy analysis and may be outweighed by the second category of *Rowland* factors.  (*Kesner*, *supra*, 1 Cal.5th at p. 1149 ["'[f]oreseeability alone is not sufficient'"]; accord, *Regents*, at pp. 633-634 [although it is foreseeable that students could hurt *anyone*, a university's duty to protect is confined to other registered students]; *Kesner*, at pp. 1154-1155 [although it is foreseeable that anyone may be harmed by asbestos carried home from the workplace by an employee, an employer's duty to protect is confined to the employee's household members].)  Those factors ask whether "'the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'"  (*Kesner*, at p. 1150.)  In other words, they ask whether recognizing the duty "would deter socially beneficial behavior."  (*Kuciemba*, *supra*, 14 Cal.5th at p. 1028.)  *Rowland* identifies four of these countervailing policy considerations: (1)

16

the moral blame attaching to the defendant's conduct, which is "typically found when the defendant reaps a financial benefit from the risks it has created" (*Kuciemba*, at p. 1025); (2) whether liability will "prevent[] future harm," which looks to "both the positive and the negative societal consequences of recognizing a tort duty" in terms of how the imposition of liability is likely to play out (*id.* at pp. 1021-1022, 1026; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1217 (*Castaneda*)); (3) the "'extent of the burden to the defendant and consequences to the community of imposing a duty . . . with resulting liability for breach'" (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 398), including whether recognizing tort liability "would impose enormous and unprecedented financial burdens" on likely defendants (*Kuciemba*, at pp. 1027, 1021-1022); and (4) the availability of insurance (*id.* at pp. 1021-1022).

## B. *Application*

Because the Lanterman Act does not explicitly create a duty running from a regional center to the employees of the residential facilities where consumers are placed,[5] the question presented here boils down to this:  Does a regional center have a special relationship with the consumers it serves that gives rise to a legal duty of care owed by the center to the employees of residential facilities that house the consumers when the center

---

[5]    Although a statute can sometimes explicitly create a duty of care (e.g., *Vesely v. Sager* (1971) 5 Cal.3d 153, 164, superseded by statute on other grounds as stated in *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 707; *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803), where it does not, courts may still examine the "public policy embodied in [the] legislatively enacted statute" when undertaking its analysis of public policy factors under *Rowland* (*Issakhani*, *supra*, 63 Cal.App.5th at p. 929; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927, fn. 8).

17

does not immediately relocate a consumer after the facility has so requested?[6]

We conclude that the answer is "no," and do so for three reasons.

1.    *The Regional Center lacks the ability—and hence the duty—to control J.C.*

The undisputed facts establish that the Regional Center does not have the ability to control J.C. and, therefore, no special relationship exists between the Regional Center and J.C. that could give rise to a duty.

The Regional Center stands in a service coordinator-consumer relationship with J.C., which is not a relationship which inherently involves the former's control over the latter. The Regional Center also does not have the ability to control J.C.'s environment, which is owned and operated by Hargis Home.  Although landlords (and schools) may have a duty to protect one tenant (or student) from another by virtue of their control over the premises (*Castaneda, supra*, 41 Cal.4th at pp. 1219-1220 [landlord]; *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 596 [same]; *Madhani v. Cooper* (2003) 106 Cal.App.4th 412, 413-415 [same]; *Regents, supra*, 4 Cal.5th at p. 634 [university]; *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 805-806 [community college]), the Regional Center is neither a landlord nor an academic institution.

---

[6]    Although, as explained above, a defendant may also be liable for its nonfeasance when it has a special relationship *with the plaintiff*, plaintiff here does not argue that the Regional Center has a special relationship *with him*.

18

More to the point of the current iteration of plaintiff's claim, and contrary to what plaintiff asserts, the undisputed facts establish that the Regional Center does not have the sole (or, as plaintiff states, "ultimate") ability to control J.C.'s placement among various facilities. Regional centers are service *coordinators*; they do not themselves own or operate residential facilities. Thus, when a consumer is to be relocated from one facility to another, the regional center must identify another facility able and willing to accept the consumer as a resident. (Accord, *Kuciemba*, *supra*, 14 Cal.5th at p. 1026 [employer that cannot "fully control the risk of infection" not liable for infections that its employees bring home from work].) Contrary to what plaintiff asserted at oral argument, a regional center cannot unilaterally relocate a consumer to a mental institution; plaintiff cites no statute or regulation providing such authority, and offered no evidence that the Regional Center had a practice of doing so for J.C. in the past. Whether Hargis Home *also* had the power to evict J.C. is therefore beside the point, as it has no bearing on *the Regional Center*'s ability to control J.C.'s placement; contrary to what plaintiff argues, Hargis Home's power to evict does not somehow imbue the Regional Center with control or otherwise make Hargis Home and the Regional Center joint tortfeasors.

Because the Regional Center lacks the ability to unilaterally control J.C., J.C.'s location, or J.C's relocation, the Regional Center necessarily lacks the *duty* to control—and hence does not stand in a special relationship with J.C. that could give rise to a duty running to plaintiff.

Plaintiff resists this conclusion with what boils down to two arguments.

First, plaintiff argues that the Regional Center's more generalized duty to monitor creates a duty. It does not. As our Supreme Court noted in *Morohoshi*, *supra*, 34 Cal.4th 482, a regional center's "monitoring responsibilities" are "important but *limited*." (*Id.* at p. 490, italics added.)

Second, plaintiff argues that he relied upon—and was dependent upon—the Regional Center to relocate J.C., and that reliance and dependency are a basis for creating a special relationship. This argument also lacks merit. For starters, this argument ignores that a plaintiff's reliance and dependency are, as explained above, typically relevant to establishing when a defendant has a special relationship *with a plaintiff* by virtue of its "superior control over the means of protect[ing]" the plaintiff. (*Regents*, *supra,* 4 Cal.5th at pp. 619-621.) But plaintiff premises his position on the Regional Center's special relationship *with J.C.*—not with plaintiff himself. We reject plaintiff's attempt to make apple pie out of oranges. What is more, the undisputed facts establish that plaintiff did not rely and was not dependent upon the Regional Center to relocate J.C. because Hargis Home— of which plaintiff was the administrator—had the power, by regulation and contract, to evict J.C. on its own, and because it knew that the Regional Center lacked the unilateral power to relocate J.C. because relocation was contingent upon a new facility accepting J.C. as a resident.

2.     *Even if the Regional Center had the ability (and thus duty) to control J.C., any such duty would be to protect J.C.—not to protect plaintiff*

As noted above, even when a duty arises by virtue of a special relationship, that duty is actionable only if that special relationship gives rise to a legal duty of care for the benefit of—

and hence to protect—the plaintiff (or the class of persons to which the plaintiff belongs). (*Regents*, *supra*, 4 Cal.5th at p. 621.) To the extent regional centers have the ability to control consumers, the sole duty that could arise from that control is the duty to benefit—and hence to protect—*the consumer*. As a general matter, the focus of the Act itself is providing services and support—and, critically, protection—*to the developmentally disabled person who is the consumer*. (E.g., §§ 4502, subds. (b)(1) & (b)(8) ["persons with developmental disabilities shall have . . . [a] right to treatment and habilitation services and supports" and "[a] right to be free from harm, including unnecessary physical restraint, or isolation, excessive medication, abuse, or neglect"], 4620.3, subd. (g)(1) [best practices for regional centers "shall not . . . [e]ndanger a consumer's health or safety"].) Nothing in the Act or any of its attendant regulations evinces any intent to create a duty to protect anyone else, including the employees of residential facilities where consumers are housed.

Plaintiff resists this conclusion as well. Specifically, he points to a regulation specifying that a "regional center" that receives notice from a residential facility that "the facility can no longer meet the needs of [a] consumer" "shall relocate [a] consumer within 30 days or within a time frame which has been mutually agreed[] upon" and "shall" "determine" "[a]ny additional measures necessary to meet the consumer's health and safety needs until the relocation has been accomplished." (Cal. Code Regs., tit. 17, § 56016, subds. (e), (f) & (g).) Plaintiff urges that this regulation creates a legal duty that obligates regional centers to protect *everyone* from injury inflicted by a consumer; plaintiff thus goes on to assert that "whether [this regulation] is directly

intended to protect only [J.C.] or [instead] other residents and staff as well is irrelevant."

Plaintiff is wrong.

As a threshold matter, plaintiff's argument conflates a *duty* of care with a *standard* of care. "The duty of care establishes whether one person has a legal obligation to prevent harm to another [citation], while the standard of care defines what that person must do to meet that obligation and thus sets the standard for assessing whether there has been a breach [citation]." (*Issakhani*, *supra*, 63 Cal.App.5th at p. 934.) By defining a time period during which relocation should occur and what a regional center should do in the interim, this regulation defines what a regional center must do to meet its obligations; in other words, it lays out a *standard* of care. "The standard of care *presupposes* a duty [of care]; it cannot *create* one." (*Id.* at p. 935.)[7]

And even if we assume that the regulation counsels in favor of recognizing a duty to protect, that duty runs solely *to the consumer*—and *not* to the employees of the residential facility where a consumer is housed because, as noted above, the Act is concerned with the well-being of the consumer, not those who come into the consumer's orbit. Plaintiff disagrees, citing a different regulation that obligates a regional center to "initiate [an] emergency relocation of [a] consumer" should various

---

[7] The undisputed facts also establish that the Regional Center complied with this standard of care: Although it did not move J.C. within 30 days of receiving notice, doing so unilaterally was—as explained above—beyond its power. However, the Regional Center immediately conducted a statewide search for a new facility, asked five facilities to accept J.C., and provided additional support personnel for J.C. during the pendency of its search.

22

"situations" "come to [its] attention," including "[t]he presence of an individual exhibiting aggressive or assaultive behavior which is life threatening to self *or others*." (Cal. Code Regs., tit. 17, § 56053, subds. (e)(1) & (a)(5), italics added.) Plaintiff urges that the italicized language evinces an intent to protect the staff of a residential facility from the "aggressive or assaultive behavior" of a consumer. But this misreads the regulation, as this provision refers to "individual[s]"—not "consumers"—exhibiting potentially injurious behavior; because the regulation uses the terms "individual" and "consumer" distinctly (*id.*, subd. (a)), we reject plaintiff's attempt to conflate them and treat them as synonymous. As written, the regulation can be read consistently with the Act itself to implement the Act's intention to protect *consumers* who might be harmed by that "individual['s]" behavior.

        3.     *Even if the Regional Center had a duty to control J.C. that triggered a legal duty to protect others, public policy disfavors the recognition of liability for breach of that duty*

Plaintiff asserts that harm to residential facility staff, other residents and anyone else within striking distance of a developmentally disabled person is reasonably foreseeable when that person has previously exhibited aggressive or violent behavior. The Regional Center does not strenuously disagree with that assertion. Although a regional center's inability to relocate a consumer on its own (that is, without the willingness of a different residential facility to accept the consumer) tends to render less close the connection between a regional center's conduct and the injury suffered, we will assume for the sake of argument that the injury suffered by third parties at the hands of

23

persons whose developmental disabilities render them aggressive or violent is reasonably foreseeable.

But do countervailing public policy considerations militate against holding a regional center liable for such a consumer's behavior if the center's attempts to relocate have yet to prove successful?

Yes, they do. The *Rowland* factors dictate this answer.

The moral blame attaching to the Regional Center's conduct is minimal. Because it is a private, nonprofit organization, the Regional Center had no profit motive for its conduct. More to the point, the Regional Center did not ignore Hargis Home's May 2018 letter requesting relocation; to the contrary, it actively conducted a statewide search for a new residential facility to house J.C. and also provided Hargis Home with additional personnel to monitor J.C. while the search was ongoing. Given these efforts, which plaintiff does not prove—or even allege—were unreasonable, the Regional Center's inability to relocate J.C. immediately was not morally blameworthy.

Imposing liability on regional centers would also not prevent future harm to third parties injured by developmentally disabled persons at a residential facility after a regional center has been asked to relocate the person. That is because regional centers do not have the unilateral power to relocate consumers; their power to do so is contingent upon the acceptance of the consumer by another residential facility, a contingency over which they do not have control. Although plaintiff tries to limit the scope of liability to injuries to residential facility staff if relocation takes longer than the 30-day default period set forth in one regulation, this limitation is artificial and unlikely to withstand scrutiny: If a regional center is to be liable for injuries

inflicted by a developmentally disabled person after the center receives notice of that person's propensity for aggression or violence, there is little basis for denying liability if an injury occurs 29 days after a relocation request or is inflicted upon another resident or guest rather than an employee of the residential facility. As noted above, this is why the regulation sets out a *standard of care* that at best provides the presumptive, default standard for breach; but it does not define the scope of *the legal duty of care*. Because, as this case indicates, developmentally disabled persons sometimes have a propensity for aggressive and violent behavior, and because regional centers are tasked with evaluating those persons in order to assess appropriate residential placements, regional centers will usually be aware of consumers' propensities; thus, if liability is imposed against regional centers due to their awareness of such propensities, they will become de facto insurers against all injuries inflicted by anyone whose services and support they coordinate whenever such a consumer acts on that propensity. (Accord, *Regents*, *supra*, 4 Cal.5th at p. 634 [expressing hesitation when the imposition of liability will convert a class of defendant into "the ultimate insurers of all . . . safety"].) Imposing such vast tort liability on regional centers that are, by definition, nonprofit entities, will likely drive them out of business and hence end up doing *nothing* to prevent future harm.

Imposing liability on regional centers for injuries inflicted by the consumers whose services and support the centers coordinate would impose a crushing burden on those centers, which are the very backbone of the body of organizations the Lanterman Act uses to dispense support and services to the population of developmentally disabled persons in California. As

25

explained above, holding regional centers liable for injuries inflicted by consumers may well drive them out of business. Because regional centers play a "vital" role in the administration of the Lanterman Act (*Morohoshi*, *supra*, 34 Cal.4th at p. 488 [regional centers play a "vital" role]; § 4620, subd. (b) [regional centers have a "special and unique nature"]), their extinction is likely to collapse the entire ecosystem of the Act, thereby depriving developmentally disabled persons of much needed services and support. Even if imposing liability does not exterminate regional centers, the imposition of tort liability is likely to skew how the centers conduct their business—and, critically, skew it in a way that is *inconsistent* with the stated purposes of the Lanterman Act. (Accord, *Castaneda*, *supra*, 41 Cal.4th at pp. 1210, 1216 [imposing liability on landlords not to rent property to "gang members" imposes unacceptable burden on landlord because it "would tend to encourage arbitrary housing discrimination" on the "basis of race, ethnicity, family composition, dress and appearance, or reputation"].) For instance, regional centers wishing to avoid liability for injuries inflicted by the consumers they serve will err on the side of placing those consumers in the most restrictive residential facilities; but that is at odds with the Act's mandate to place consumers in the "least restrictive environment." (§ 4502, subd. (b)(1).) Along similar lines, and as the trial court noted, regional centers facing liability will inevitably factor the potential for liability into their decisionmaking when it comes to services and support; but that is at odds with the Act's focus on what is best for *the consumer* (rather than on what is best for the regional center's risk management strategy). These burdens are particularly unwarranted where, as here, the plaintiff already

26

has another available remedy for injuries—namely, workers' compensation.  Citing *Kesner*, plaintiff urges that we may not consider the likely burdens of imposing liability; plaintiff misreads *Kesner*, which declares irrelevant any consideration of how recognizing a duty would impose liability for *past* acts, but allows a forward-looking assessment of the burdens that the recognition of tort liability would impose.  (*Kesner*, *supra*, 1 Cal.5th at p. 1152.)

The imposition of liability may or may not be mitigated by the availability of insurance.  Plaintiff observes that Hargis Home is able to obtain insurance.  But Hargis Home has control over the premises where its employees work and its residents live.  It is far from clear that insurers would insure regional centers for the type of open-ended liability that may accrue here when such centers lack the ability to relocate consumers on their own, and hence lack the ability to mitigate (or, for that matter, even manage) liability arising from the failure to relocate.

On balance, these factors resoundingly favor the conclusion that regional centers should not be liable in tort to residential facility employees for failing to relocate a developmentally disabled person despite a facility's request to do so.

\*       \*       \*

In light of our analysis, we have no occasion to reach the further issue of whether plaintiff has assumed the risk of injury from Hargis Home's developmentally disabled residents by agreeing to be employed as the facility's administrator.

27

## DISPOSITION

The judgment is affirmed.  The Regional Center is entitled to its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
 ASHMANN-GERST


_____, J.
 CHAVEZ