Filed 4/30/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| B.D.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A172485<br><br>(Contra Costa County Super. Ct. Nos. J24-00072, J24-00073) |

B.D. (Mother) seeks extraordinary relief from a juvenile court order at the six-month review hearing that terminated family reunification services and set a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  Mother raises two contentions:  first, the Contra Costa County Children and Family Services Bureau (Bureau) did not provide her with reasonable reunification services; and second, the juvenile court erred in concluding Mother failed to "make substantive progress in a court-ordered treatment plan."  (§ 366.21, subd. (e)(3).)

We reject the first contention but find merit in the second.  The "substantive progress" test under section 366.21, subdivision (e)(3), is a

_____

[1]        Further unspecified statutory references are to this code.

1

qualitative assessment of whether a parent has demonstrated meaningful engagement and improvement in the various educational, therapeutic, and assistive components of the case plan. At this generally early stage of the dependency scheme, a parent who regularly participates and makes substantive progress in a court-ordered treatment plan may receive continued services without demonstrating they will likely overcome the problems that led to a dependent child's removal. Here, the record at the six-month review hearing showed that Mother had successfully completed most of her parenting education courses, consistently engaged in weekly individual therapy sessions, and regularly visited the children without resorting to inappropriate physical discipline (the original protective issue in this case). On this record, the juvenile court's finding that Mother did not make substantive progress in her treatment plan was not supported by substantial evidence meeting the clear and convincing threshold. (§ 366.21, subd. (e)(3).)

Notwithstanding our clarification of the "substantive progress" standard, we conclude the juvenile court's error was harmless under the circumstances. The six-month review hearing in this case was held nearly a year after the children entered foster care. As such, the 12-month review hearing, with its heightened standards for continuing reunification services, was imminent. Despite Mother's "substantive progress" in her case plan, she and the children's father were still not demonstrating "significant progress" in resolving the problems that led to the children's removal (§ 366.21, subd. (g)(1)(B)), nor had they shown the capacity and ability to provide for the children's safety, protection, physical and emotional well-being, and special needs (*id.* subd. (g)(1)(C)). Thus, even if reunification services had been continued to the 12- or even 18-month review hearing, it is not reasonably probable Mother would have been able to show a "substantial probability"

that the children "will be returned" to the parents' physical custody and safely maintained in their home within the extended period of time. (§ 366.21, subd. (g)(1).) Accordingly, we will deny Mother's petition for extraordinary relief.

FACTUAL AND PROCEDURAL BACKGROUND

**A. Juvenile Dependency Petitions**

All date references are to 2024, unless otherwise specified.

On February 4, the Bureau filed a dependency petition on behalf of four-year-old S.R., alleging she had suffered serious physical harm as a result of Mother's inappropriate physical discipline (count a-1). The petition alleged that Mother disciplined S.R. by closing a sliding door on her arm, causing a fracture. The petition further alleged the parents' failure to protect S.R., as Mother did not seek timely medical care despite observing bruising and swelling on S.R.'s arm (count b-1), and the children's father (Father) was aware of Mother's conduct but did not protect S.R. from physical harm (count b-2).

A separate petition was filed on behalf of S.R.'s sibling, O.R., age two, alleging she was at substantial risk of abuse or neglect due to the incident involving Mother and S.R. (count j-1), and Father's failure to protect S.R. (count j-2).

**B. Detention/Jurisdiction Report**

The detention/jurisdiction report included the following information.

On January 26, Mother called the hospital to report that S.R. had severe pain after an incident five days prior when Mother slammed the door on S.R.'s arm. S.R. was diagnosed with a right proximal ulna fracture.

Mother told a hospital social worker that she had been " 'having a bad week' " and repeatedly told the children to stop playing with a sliding door.

3

After Mother disciplined S.R. by closing the door on her arm, S.R. cried for at least 10 minutes, and Mother felt bad and hugged S.R. until she stopped. S.R. did not seem to be in pain until later in the week. Mother delayed seeking medical treatment for S.R. because Mother had felt mistreated by hospital staff when S.R. broke her clavicle in an accidental fall two years prior.

The hospital social worker reported that Mother claimed to have a " 'receptive/responsive disability' " and showed "difficulty expressing herself as noted by frequent pauses, tears, failure to attend to basic care needs when upset, and, reports not remembering the last time she was happy." The report expressed concern about Mother's "current emotional state, overall fear, and, mild cognitive/expressive communication deficits."

The social worker further noted S.R. had been diagnosed with autism. Mother reported having a caseworker at the Regional Center of the East Bay (Regional Center), but the Regional Center told the social worker that Mother and S.R. were not registered clients.

Mother reported that Father " 'works full time and is out of the home a lot,' " and that she got little or no help from him. Father confirmed he was home but in another room when the incident between Mother and S.R. occurred. He "did not check on [S.R.] when crying after being hurt" and did not encourage Mother to seek medical care for S.R.'s arm. He said Mother was a good mother but was feeling overwhelmed.

On February 6, the juvenile court found Father to be the presumed father and ordered the children detained and placed with their paternal grandparents. The parents were granted two hours of visitation per week.[2]

[2]     Although Mother initially claimed Cherokee heritage, the record reflects that after further due diligence and inquiry by the Bureau and the

4

## C. Jurisdiction

At the initial jurisdiction hearing on February 22, the juvenile court appointed a guardian ad litem (GAL) for Mother at Mother's request. Father pled no contest to the counts against him, and the court sustained count b-2 of the petition filed on behalf of S.R., and count j-2 of the petition filed on behalf of O.R. On March 8, the juvenile court sustained counts a-1 and b-2 of the petition filed on behalf of S.R. against Mother, and count j-1 of the petition filed on behalf of O.R. against Mother.

## D. Disposition Report

On April 11, the Bureau filed a disposition report recommending out-of-home placement for the children and reunification services to the parents. The report indicated Mother "struggled answering the questions" and was "verbally delayed in her responses." She reported that her own birth had been difficult and that she had been in special education "due to a speech delay and her 'mentality.' " Mother also shared she had a "[r]eceptive [r]esponsive [d]isorder" and had " 'a hard time thinking of the right words to say.' " She had been diagnosed with depression and was receiving therapy and supplemental security income. Maternal grandfather corroborated that Mother had suffered "brain damage" at birth and had been in special education and speech therapy.

The Bureau reported that S.R. was diagnosed with autism spectrum disorder and was receiving early intervention and applied behavior analysis services through her school. She did not spontaneously speak and instead communicated by leading people around and pointing. O.R. was diagnosed

---

juvenile court over the course of several months, the court found that the Indian Children Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply. Mother does not raise a claim of ICWA error in this proceeding.

5

with failure to thrive. She had speech delays and made repetitive hand movements, and her pediatrician was considering a referral for autism.

During visitation with the children, Mother was engaged and interactive, while Father was minimally engaged, often looked to Mother to care for the children, and was quick to anger with them.

At the start of the disposition hearing on April 11, Mother's counsel requested a continuance. Highlighting the Bureau's acknowledgement of Mother's "special needs and disability," Mother's counsel expressed concern that Mother "needs a specifically-tailored case plan that she can understand, and the way this report is currently written, I don't think it's going to be as helpful to her." Counsel further explained that although Mother had completed an eight-week parenting class and was awaiting a certificate of completion, "she may need something more hands-on, something of that nature that is going to really benefit her if reunification is going to have a chance at . . . success." The juvenile court granted the request and continued the disposition hearing to May 16.

On May 1, the Bureau filed a status update reporting that the agency C.O.P.E. had offered the parents in-person parent coaching, a family transitions course, a course geared towards fathers, and in-person co-parenting counseling. O.R. was already receiving services from the Lynn Center, and an intensive care coordinator (ICC) would assist Mother with the children's services. Additionally, the social worker reported that Mother had applied for Regional Center services in 2013 for "speech/language delay" but did not qualify for services. However, the social worker was informed that Mother would qualify for Regional Center services if she provided documentation such as her individualized education plan from school or a letter of support from a primary care physician regarding her intellectual

6

disability.  The social worker indicated she "would work with [Mother] to obtain the necessary paperwork."

At the continued disposition hearing on May 16, the juvenile court noted its receipt of the Bureau's update on reunification services as well as certificates from both parents showing their completion of a Triple P Positive Parenting program.  Minors' counsel indicated she had received "the new case plan" and "was really pleased to see some of the services that are being arranged for this family because we don't often see this level of services, . . . especially the parent coaching in person."  Mother's counsel indicated the "more tailored" current case plan "is one that we are prepared to submit on."  Mother's GAL similarly expressed gratitude for the modified case plan, stating that "to get a specifically-tailored case plan like this is going to hopefully make all the difference.  So I am glad that we postponed it so that the social worker could tailor it to mom's needs."

The juvenile court adopted the findings and recommendations of the Bureau in its disposition report.

### E. Six-Month Review Report

On November 7, the Bureau filed its six-month review report recommending that reunification services be terminated and that a section 366.26 permanency planning hearing be set.  The Bureau believed it would be detrimental to return the children to the parents' custody because the parents "have yet to address and overcome the issues that led to the Bureau's involvement.  [Mother] has been engaging in parenting education classes, individual coaching, and individual therapy, but to date continues to lack the parenting skills needed to meet her children's basic needs.  [Mother] needs coaching in visitation in order to address her children's behaviors.  [She] has

7

only recently started mental health services and has not made enough progress in therapy yet."

Father, meanwhile, "delayed engaging in reunification services and participating in meetings, but even after a completion of classes and participation in therapy he still lacks the parenting skills. [He] resorts to using physical punishment whenever the children do not listen to his commands, despite engaging in services. [His] parenting skills are a high concern for the Bureau as this form of discipline could lead to the children being abused." The Bureau did not believe the parents would likely reunify even if given additional services.

The report described in detail how Mother would shrug and say " '*I don't know*' " when asked her perception of her needs and "what she needs to do to reunify." Mother admitted "she needs assistance with learning alternative ways to parent and discipline her children," but when asked what she would have done differently to prevent herself from abusing the children, she could not answer.

After a mental health assessment, Mother was recommended individual therapy. Although Mother initially delayed, she eventually started therapy in September. The social worker noted that Mother would often "shut down emotionally" and get "overwhelmed, crying, and withdrawing from conversations." Mother expressed hope that therapy would help her build self-esteem and confidence, learn how to advocate for herself and manage her emotions, and reduce her anxiety and depression. Mother's therapist, Jaime McCormick, "confirmed concerns regarding [Mother's] developmental disability." Mother was prescribed Zoloft and Trazodone to reduce anxiety and depression but "admitted to forgetting to take her medication."

The parents argued on a regular basis, and Mother felt their relationship had been negatively impacted since the children entered foster care. She believed Father minimized her parenting, which made her feel ignored. She further reported not getting along with paternal grandparents, whom she described as "bullies."

S.R. was still nonverbal and receiving services from the Regional Center and school. She frequently had tantrums during which she would scream and kick. O.R. was nonverbal and borderline on an autism assessment.

The Bureau further reported that despite Mother's completion of a Triple P Parenting Education class and a Family Transitions class, she "still needs assistance with learning new strategies to parent her children and meet their emotional needs" and "becomes overwhelmed and freezes whenever she tries to parent her children and they do not listen. [Mother] is capable of being coached by the visitation monitor and her family partner, but is not able to troubleshoot in visits whenever a strategy given to her (by a provider) does not work." Mother "has not used physical punishment in supervised visits, but is not able to state what she will do differently if the children do not listen to her command." Still, Mother had regularly "participated in service provider meetings regarding her children's special needs" and "is able to follow conversations regarding the children's development" and "answer questions about her children's development." Furthermore, she "has been cooperative with the Bureau regarding her children's educational needs."

The Bureau was "working diligently with [Mother] to gather records pertaining to [her] disability to assist her with submitting a regional center referral for herself. [Mother] is hesitant when the team attempts to request

9

her records, but [she] eventually agrees. A regional center referral should be submitted soon for [Mother], but the hope is to get [her] to qualify to receive services related to her disability."

Father completed a parenting course and was enrolled in Family Transitions and coparenting classes. He also attended individual therapy and was waitlisted for a Supporting Father Involvement class. Although he had recently begun participating in ICC meetings for O.R., he delayed beginning services and missed many of the service provider meetings. The Bureau believed Father lacked the capacity to protect the children from Mother.

Regarding visitation, the Bureau reported that both parents did a good job confirming their visits and arriving on time. The children were "always happy and excited to see their parents" and showed affection for them. The parents brought activities for the family to engage in and provided affection and support. The Bureau, however, was still concerned that the parents spent a significant amount of time at the beginning of visits not attempting to interact with the children. On one occasion, O.R. came to the visit "sick" and apparently in pain, and Mother had to be instructed to console and hug her. Also, when the girls fought over toys, the parents struggled to separate them and required constant coaching from the visit supervisor. The report noted that Mother "has accepted assistance from [the social casework assistant] and her family partner through the Lynn Center, which is evident because [Mother] attempts to try to implement what she has learned," but she "continues to 'freeze' in visitation."

The report also indicated that Mother was "impacted by [Father] in visitation in that she expects him to assist her in visitation and does not feel he assists her enough. [Father] has also been observed in visitation to speak

to [Mother] in a mean and aggressive tone," which "results in [Mother] 'shutting down' in visits by having a flat affect and in turn she then stops engaging with the children. The Bureau explored changing the visitation, but both parents agreed to keep it the same."

The Bureau did not believe it was safe to allow visits in the community as requested by the parents. During one visit, the social worker had taken the family outside the office, and S.R. tried to run for the street. Mother "attempted to run, but stopped right away and [Father] did not run after [S.R.] at all." The social worker ran to grab S.R. before she ran into the street.

The Bureau was also concerned about Father "firmly speaking to the children" and raising his voice when they did not listen. He was also witnessed "numerous" times "grabbing and shaking the girls by the arms and necks in visitation when they do not listen" and "yank[ing] the children's arms to redirect them."

### F. Status Report

In a status report dated January 21, 2025, the Bureau maintained its recommendations to terminate reunification services and set the matter for a permanency planning hearing.

The children continued to do well in their placement with paternal grandparents. Mother was enrolled in a coparenting class and had signed a release of information for the Bureau to "assist her with exploring services." Accordingly, social worker Eric Guzman obtained 400 pages of Mother's medical records and was reviewing them for submission to the Regional Center, which confirmed that Mother could undergo assessment for an intellectual disability. Mother had delayed submission of the regional center application over the review period and was hesitant to sign a release of

11

information because she worried her teachers would document embarrassing things she did as a child. At one point, Mother indicated she wanted to discontinue the assessments "because she was already assessed and did not qualify."

Mother remained "actively engaged" in individual therapy on a weekly basis and was taking her medication as prescribed. Therapist McCormick was "working with [Mother] on building her self-esteem and doing activities that help with her self-care," and reported she was "consistent and participates in therapy to the best of her ability." However, McCormick did not "believe [Mother] understands the Bureau's involvement fully and has not made enough progress in her reflection to overcome the issues in this moment." Though McCormick would have liked Mother to receive additional reunification services, he did "not feel she will be able to make the necessary changes" even if given additional services.

Father participated in parenting classes and was enrolled in coparenting classes. His therapy was discontinued, purportedly due to medical insurance issues. Father believed he had "no issues currently."

The parents continued to attend weekly visitation with the children but still required assistance to meet the children's needs.

The Bureau further reported the parents "continue to remain in a relationship and would like to reunify together but have not made the behavioral change necessary to show that they can both adequately parent the children on their own." The Bureau did not believe it would be in the children's best interest to provide more services given that the 12-month mark was fast approaching, and the parents had not made substantial progress that would indicate a likely reunification.

### G. Six-Month Review Hearing

The contested six-month review hearing commenced on January 23, 2025. Social worker Guzman testified regarding his involvement with the family since June 2024.

Guzman explained that Mother had made "slight improvements but, overall, there are still a lot of concerns regarding her parenting" due to her inability "to articulate some of the new things that she has learned." He understood that Mother had "some sort of delay," and he assisted her with services so she could understand what she needed to learn in order to comply with the case plan. Guzman further explained that they had explored the Regional Center for "additional services," but that the application process was delayed because of Mother's resistance, in part because it had previously been determined in 2013 that she did not qualify for Regional Center services so she felt she would not qualify this time. Guzman asked Mother "at least seven times" to apply to the Regional Center. Mother eventually agreed to proceed with the application process, and Guzman reviewed over 400 medical records and managed to submit an application to the Regional Center on Mother's behalf on the second day of the contested six-month hearing.

Guzman testified he attended team meetings approximately every two weeks with Mother, the family coach, and the social casework assistant to collaborate about the concerns seen within visitation, but these meetings had been put "on hold" since November 2024 when the Bureau recommended terminating services.

Guzman further testified the parents visited regularly with the children, who were "absolutely" excited to see the parents. The parents were well connected to both girls, and no visits were cancelled due to inappropriate behavior by the parents. Although Mother had no physical discipline issues

13

with the children, there were times when Father grabbed and shook the children, which remained a concern for the Bureau.

The Bureau was also concerned that Mother lacked parenting skills and confidence, as "she kind of throws up her hands and doesn't really know what to do" when the children would not respond to redirection. Similarly, when the parents disagreed, Mother would get upset and shut down. Guzman had referred the parents to a Regional Center support group for parents with developmentally delayed children, but the parents did not participate. They also did not attend coparenting counseling, as Father said "there was no point in him engaging in that service because it wasn't going to change the circumstances, and then mom just has not followed up with [C.O.P.E.] to reenroll."

Guzman believed the parents would not be able to reunify with the children by the 12-month review date or even by the 18-month review date due to their minimal progress and Father's refusal to take the case plan seriously. The Bureau recommended legal guardianship with the paternal grandparents. Though Guzman acknowledged there was animosity between Mother and the paternal grandparents, the Bureau intended to offer Mother supervised visits with the children.

The juvenile court found by clear and convincing evidence that there remained a substantial risk of detriment to the safety, protection, and physical and emotional well-being of the children. The court found "very minimal improvement on behalf of the parents" even though Mother "has been trying to the best of her abilities." And though Mother had refrained from physically disciplining the children, "the pendulum has swung too far in the opposite direction, and to the point where she now has a completely hands-off approach" and "is almost throwing her hands up in the air . . . in a

14

gesture of not being sure what to do." The court also expressed concerns about Father's physical discipline of the children, and the impact of his attitude on Mother.

The juvenile court further found by clear and convincing evidence that the Bureau had provided more than reasonable services, and that "[t]he parents have failed to make substantive progress, even with all of the supports that have been offered and provided. It does not appear that we have made much progress from where we were a year ago. And I will not find that there is a substantial probability of return by the 22nd, or even . . . within the 18 months at this point, given the lack of progress, and as indicated by even mother's therapist, an inability to address those, or any indication that those issues would be addressed in the future." The court adopted the recommendations of the Bureau and set the section 366.26 hearing for May 29, 2025.

Mother timely filed a notice of intent to file a petition for extraordinary writ relief, and subsequently filed her petition challenging the juvenile court's February 14, 2025 order terminating services and setting the section 366.26 hearing. On March 27, 2025, we issued an order to show cause why relief should not be granted.

## DISCUSSION

### A. Standard of Review

"We review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion." (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223.) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from

15

which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.) " 'Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971).)

We review issues involving the interpretation and proper application of the dependency statutes de novo. (*In re M.F.* (2022) 74 Cal.App.5th 86, 100 (*M.F.*).)

## B.    Reasonableness of Reunification Services

Because family preservation is " 'the first priority' " in dependency proceedings, " 'the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family.' " (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174–175 (*M.V.*).)

Section 361.5, subdivision (a), sets forth various "time limitations" on reunification services depending on the child's age. (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1034–1035.)  For children over the age of three on the date of initial removal, the presumptive period of services is 12 months, with an 18-month maximum.  (§ 361.5, subd. (a)(1)(A), (3).)  For children under the age of three at the time of initial removal, "services shall be provided for a period of 6 months from the dispositional hearing . . . , but no longer than 12 months from the date the child entered foster care." (§ 361.5, subd. (a)(1)(B).)  And where, as here, a "sibling group"—two or more children related as full or half siblings—is removed from their parents' custody, and one of the siblings is under three years of age on the date of initial removal, "court-ordered services for some or all of the sibling group

16

may be limited as set forth in subparagraph (B)." (§ 361.5, subd. (a)(1)(C).) In other words, the presumptive period of reunification services for applicable sibling groups is six months from the date of the dispositional hearing per section 361.5, subdivision (a)(1)(B).

In such cases, the juvenile court may, at the six-month review hearing, schedule a permanency planning hearing under section 366.26. (§ 366.21, subd. (e)(3).) "If, however, the court finds . . . that reasonable services have not been provided, . . . the court shall continue the case to the 12-month permanency hearing." (*Ibid*.) "[T]he court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian." (*Id*., subd. (e)(8).)

" 'Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) Thus, while "services need not be perfect," they "should be tailored to the specific needs of the particular family." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793–794 (*David B.*).) In this regard, " '[t]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and

17

offering more intensive rehabilitation services where others have failed).' " (*Ibid.*)

In this case, the Bureau provided the parents with referrals to parenting classes, counseling services, coaching programs, and individual therapy; a parent partner; a family coach; and a family partner from the Lynn Center and an ICC to assist with the children's services. In spite of these services, Mother contends that none of the components of her case plan included accommodations for her disability, and that furthermore, "despite Mother's repeated claims of being overwhelmed, having anxiety, depression and not understanding things, there were no additional referrals made."

It is well-settled that "when a parent has a mental illness or disability, that condition must be the 'starting point' for a family reunification plan, 'not its conclusion.' " (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1241 (*T.J.*), disapproved on another ground by *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8 (*Michael G.*).) "[B]efore the parental rights of a developmentally disabled parent can be properly terminated the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored." (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320 (*Victoria M.*).)

Here, the Bureau was aware at all relevant times that Mother had developmental delays. Indeed, the charging petition specifically alleged that Mother's failure or inability to protect S.R. from serious physical harm or illness was due to mental illness or developmental disability. Aside from the referral for individual therapy, it is unclear from the record whether any of the parenting classes, coaching, or in-person services in Mother's case plan were specifically geared towards assisting a parent with developmental disabilities. (Compare *T.J.*, *supra*, 21 Cal.App.5th at p. 1241 [discussing

18

agency's provision of "services to those with developmental disabilities" and in-home counseling and parenting services "for parents with intellectual disabilities"] with *Victoria M.*, *supra*, 207 Cal.App.3d at p. 1327 [finding "nothing in the reunification plan itself which appears to be tailored to [parent's] intellectual limitations"].) While referrals were made to "Through the Looking Glass, an agency that supports individuals with disabilities," and for a medical social worker to assist Mother in applying for in-home supportive services, the record does not disclose the fate of those referrals.

The Bureau nevertheless contends Mother forfeited her claim that the original case plan did not contain disability accommodations by not appealing from the disposition order. On this specific point, we agree. An unappealed disposition order is final and binding and may not be attacked on an appeal from a later appealable order. (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355. Here, Mother submitted on the Bureau's disposition recommendations and case plan with no objections, and she did not appeal from the juvenile court's disposition order adopting those recommendations. Not only that, but Mother successfully obtained a continuance of the initial disposition hearing for the express purpose of better tailoring the case plan to her special needs. In response, the Bureau arranged for more educational and assistive services to Mother, and at the continued hearing, Mother submitted without objection to "this current case plan," while the GAL remarked she "was glad we postponed [the hearing] so that the social worker could tailor [the case plan] to mom's needs." On this record, Mother forfeited her contention that the original case plan adopted by the court at disposition was insufficient to meet her special needs.

But another facet of Mother's argument is that "additional referrals" should have been made when she reported feeling overwhelmed, anxious, and

19

depressed, and that she was struggling to understand the proceedings and to remember to take her medication. We conclude Mother's forfeiture of her challenge to the original disposition order does not foreclose a claim that additional services should have been considered at the six-month review based on developments during the review period.

If a juvenile court determines at the six-month review hearing that return of a dependent child would be detrimental, the court must make appropriate findings "and, when relevant, shall order any additional services reasonably believed to facilitate the return of the child to the custody of their parent or legal guardian." (§ 366.21, subd. (e)(2).) We read "additional services" here to mean services *in addition to* those already ordered at the disposition hearing, as opposed to an additional period of existing services. This interpretation is supported by other parts of the statute that clearly denote when the Legislature intended to refer to the continuation of existing services. (See, e.g., § 366.21, subd. (e)(7) ["court shall direct that any reunification services previously ordered shall continue to be offered to the parent"].) Our interpretation is also reinforced by California Rules of Court, rule 5.710(a)(4), which states that at the six-month review hearing, if the court does not set a section 366.26 hearing, it "must order that any reunification services previously ordered will continue to be offered to the parent," and "[t]he court may modify those services as appropriate or order additional services reasonably believed to facilitate the return of the child to the parent or legal guardian." Taken together, section 366.21, subdivision (e)(2) and California Rules of Court, rule 5.710(a)(4) provide parents a basis for obtaining "additional services" beyond those originally ordered at disposition. We also observe that ordering additional services is within the

20

ambit of the juvenile court's authority to "modify the terms and conditions of" the "reunification services previously ordered." (§ 366.21, subd. (e)(7).)

Having recognized Mother's right to claim additional services, we nevertheless conclude the Bureau satisfied its obligation by actively encouraging and assisting her to apply to the Regional Center. Regional centers are specifically designed to provide services to persons with developmental disabilities (see *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 487–490), and "the rights of a developmentally disabled parent may not be terminated without first assessing whether the services offered by the state through regional centers may enable the family of a disabled person to remain intact" (*Victoria M.*, *supra*, 207 Cal.App.3d at pp. 1329, 1331).

Although a Regional Center referral was not specifically mentioned in Mother's original case plan, the Bureau recognized early on that "a regional center referral should be submitted soon." Here, the record reflects that social worker Guzman asked Mother "at least seven times" to apply to the Regional Center. However, Mother was resistant to do so because she had been previously assessed and denied services by the Regional Center, and she vacillated on going through the process again. Although an application on Mother's behalf was eventually submitted to the Regional Center on the second day of the contested six-month review hearing, that occurred only because of Guzman's tenacity and review of hundreds of Mother's medical records in support of the application. In short, the Bureau appropriately recognized Mother's need for Regional Center services and "made reasonable efforts to assist [her] in areas where compliance proved difficult." (*David B.*, *supra*, 123 Cal.App.4th at p. 794.) On this record, we cannot say the Bureau failed to provide reasonable "additional services" sufficiently tailored to Mother's special needs.

21

Nor are we convinced by Mother's argument that she was denied reasonable services because the team meetings between her providers were discontinued in November 2024. We acknowledge section 706.6, subdivision (a), recommends that case plans implement a " 'team-based approach' " in order to increase efficiency, reduce costs, and coordinate formal services with informal supports. But the record reflects that six team meetings had been held by the time the ICC requested discontinuation of the meetings due to the Bureau's recommendation to terminate services. Mother does not explain why the team meetings were especially significant for her, and she does not dispute her ongoing access to the ICC and other service providers even though the team meetings were discontinued. Although it may have been ideal for the team meetings to continue, we are not persuaded that the change in this aspect of Mother's case plan demonstrates a failure to provide reasonable services under the circumstances. (See *Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)

Mother further contends the Bureau should have done more to assist her, such as seeking "additional help in communicating" when Mother struggled to answer the social worker's questions; requiring the GAL's presence for meetings; and seeking assistance to help Mother remember to take her medication. But given the ample resources and supports that were already in place, which included weekly individual therapy, a parent partner, and weekly in-person coaching from the social casework assistant, we agree with the Bureau that Mother already had reasonable services available to her to help address these particular issues.

On this record, we conclude the juvenile court's reasonable services finding was supported by substantial evidence meeting the clear and convincing threshold. (§ 366.21, subd. (e)(8).)

22

## C.   Substantive Progress in Court-Ordered Treatment Plan

At the six-month review hearing, in cases involving a section 361.5, subdivision (a)(1)(C) sibling group, a juvenile court may terminate reunification services and set a permanency hearing under section 366.26 if it finds by clear and convincing evidence that a parent "failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).)

The parties dispute whether clear and convincing evidence supported the juvenile court's finding that Mother failed to make substantive progress in her case plan.  In challenging the court's finding, Mother points to evidence in the record that she completed multiple parenting education courses, engaged in weekly therapy sessions, communicated regularly and willingly with her service providers, attended visitation with the children regularly, and never physically disciplined the children again.  The Bureau counters with its observations that Mother did not participate in coparenting classes and counseling and delayed seeking individual therapy for several months after disposition.  The Bureau also points to incidents in which Mother's parenting skills and judgment were shown to be lacking, such as the numerous times she froze and disengaged during visits with the children, as well as the incident when she did not do more to stop S.R. from running towards a street.[3]

_____

[3]      The Bureau also accuses Mother of leaving "two year old O.R. home alone in the past."  The accusation stems from the six-month review report, which states that "in September 2024, [Mother] reported to a service provider that she did not know it was inappropriate to leave a two-year-old child at home by themselves."  But earlier in the same report, the incident is described in more detail as follows:  "On September 30, 2024, the undersigned received information that [Mother] had reported that when she had custody of the children, she would leave [O.R.] at home by herself while

23

This dispute requires us to interpret the meaning of "substantive progress in a court-ordered treatment plan" as used in section 366.21, subdivision (e)(3). This is a matter of statutory construction that we review de novo. (*M.F.*, *supra*, 74 Cal.App.5th at p. 100.)

We first turn to the relevant language of the statute: "If the child was under three years of age on the date of the initial removal, or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to their parent or legal guardian within 6 months . . . , the court shall continue the case to the 12-month permanency hearing." (§ 366.21, subd. (e)(3).)

By its terms, section 366.21, subdivision (e)(3) sets forth a two-step process whereby the juvenile court must first determine whether the parent "failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) If the court so finds, it "may" terminate reunification services and schedule a section 366.26 hearing unless the court finds a substantial probability that the child may be returned within six months, in which case the court "shall" continue the case

she took [S.R.] to school. [Mother] reported she would *only* do this when [O.R.] was sleeping (and did not want to wake her up) *and [Father] is at home.* [Mother] reported she did not know this was not appropriate." (Italics added.) We do not know what to make of the assertion that Mother left O.R. "by herself" but "only" when Father "is at home." Perhaps there is a misstatement in the report, but we are not aware of any subsequent corrections by the Bureau. Without more, the report does not provide adequate support for the Bureau's accusation.

to the 12-month review. (*Ibid.*; see *M.V.*, *supra*, 167 Cal.App.4th at pp. 175 – 176 [discussing "two distinct determinations" under § 366.21, subd. (e)(3)].)

Although section 366.21 does not define what is meant by "substantive progress," the term must mean something more than regular participation in services. That is, section 366.21, subdivision (e)(3)'s reference to a finding of a parent's failure to both "participate regularly *and* make substantive progress in a court-ordered treatment plan" (italics added) plainly indicates that regular participation alone would not be sufficient to obtain continued services.[4] The parent must also make "substantive progress in court-ordered treatment," a phrase that contemplates a qualitative assessment of the parent's conduct. As we see it, the phrase denotes the parent's meaningful engagement and real improvement in making use of the various educational, therapeutic, and assistive components of the case plan.[5] Put another way, a parent must be doing appreciably more than just going through the motions of the case plan in order to show substantive progress.

But section 366.21 also reflects the understanding that a showing of "substantive progress" at the six-month review phase does not require a parent to demonstrate the same degree of progress that is ultimately needed

---

[4] The prior version of the statute only required a finding that "the parent failed to participate regularly in any court-ordered treatment plan." (§ 366.21, former subd. (e)(3).) The Legislature amended the statute in 2000 to add "and make substantive progress." (Stats. 1999, ch. 399, § 2, p. 2722.)

[5] Merriam-Webster's Online Dictionary defines "substantive" as "having substance," "considerable in amount or numbers," and "real rather than apparent." (Merriam-Webster's Online Dict. (2025) <https://www.meriam-webster.com/dictionary/substantive> [as of Apr. 29, 2025]; see *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1334 [" 'When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word.' "].)

for reunification.  This understanding is intrinsic to the escalating nature of the dependency process.  "The dependency scheme sets up three distinct periods and three corresponding distinct escalating standards for the provision of reunification services to parents of children under the age of three" in which (1) services are "afforded essentially as a matter of right" between the jurisdiction hearing and the six-month review hearing; (2) a heightened showing is required to continue services between the six- and 12-month review hearings; and (3) services are available between the 12- and 18-month review hearings "only if" the court makes specific findings relating to the parent's progress.  (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.)  "The effect of these shifting standards is to make services during these three periods first presumed, then possible, then disfavored."  (*Ibid.*)

Consistent with these escalating standards, the Legislature has imposed a heightened "clear and convincing evidence" standard in the parent's favor at the six-month review phase, when services are first transitioning from presumed to possible status.  The juvenile court is not authorized to set a section 366.26 hearing at the six-month review hearing unless the parent's failure to make substantive progress in court-ordered treatment is shown by "clear and convincing evidence."  (§ 366.21, subd. (e)(3); *M.V.*, *supra*, 167 Cal.App.4th at pp. 175–176.)  By contrast, the statute does not impose this heightened standard of proof in the parent's favor at the later review stages when continued services have become disfavored.

Furthermore, at the 12- and 18-month review phases, section 366.21 requires a showing of "significant progress" by the parent "in resolving problems that led to the child's removal from the home" (§ 366.21, subd. (g)(1)(B).)  Specifically, section 366.21, subdivision (g), which applies

26

when a child has not been returned by the time of the 12-month permanency hearing, provides in relevant part that the juvenile court can continue the case for another six months "only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g)(1).) "[I]n order to find a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following: [¶] (A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Id.*, subd. (g)(1)(A)(B)(C).)

We must assume a meaningful distinction between the adjectives "substantive" and "significant" as they relate to parental "progress" within the same statute. (See *People v. Santos* (2020) 53 Cal.App.5th 467, 473 [where Legislature uses different word or phrase in one part of statute than it does in another, it must be presumed that Legislature intended different meaning].) We must also emphasize that these two measures of parental progress relate to distinct objectives, as the "substantive progress" requirement of section 366.21, subdivision (e)(3) relates specifically to the parent's involvement in court-ordered services, while the "significant progress" of section 366.21, subdivision (g)(1)(B) relates more broadly to the parent's resolution of the "problems that led to the child's removal from the

27

home." Even accepting that these objectives overlap since the services are designed to help the parent ultimately resolve the problems that led the child's removal, we must still recognize that they correspond to different phases of an escalating process.

In light of the foregoing, we conclude the "substantive progress" required of a parent to receive continued services at the six-month review under section 366.21, subdivision (e)(3) is not reasonably read to demand the same degree of progress required of the parent to support a finding of substantial probability of a dependent child's return at the 12-month review phase and beyond. In our case, we have a parent whose substantive progress was amply demonstrated at the time of the six-month review hearing. She was actively engaged in her case plan, successfully completed two of the three required parenting courses (and enrolled in the third), willingly communicated and cooperated with the Bureau and her providers, visited the children regularly, and demonstrated during those visits that she was trying to apply parenting lessons she had learned. True, Mother continued to experience mental and cognitive difficulties, including an inability to express herself during questioning from social workers. But such difficulties apparently stemmed from known developmental and speech delays, and Mother consistently engaged in weekly individual therapy to address these and other concerns. She was otherwise accepting of coaching, receptive to guidance, and willing to change. The few areas of the case plan where Mother's performance fell short (e.g., not completing coparenting class and counseling, delaying in seeking individual therapy) do not support a finding by clear and convincing evidence that Mother failed to make substantive progress.

The Bureau's main criticisms of Mother pertain to her inability to demonstrate effective parenting skills and judgment at certain difficult times during the review period. But in none of those instances did Mother revert to physical discipline of the children—the protective issue that led to the children's removal in the first place. Indeed, the Bureau reported that there were "times where [the parents] are able to manage the tantrums" and that Mother "attempts to try to implement what has she has learned." This likewise reflected Mother's real and appreciable progress in her efforts to learn from the programs in her case plan.

Nevertheless, the juvenile court concluded that "[t]he parents have failed to make substantive progress" because "[i]t does not appear that we have made much progress from where we were a year ago. And I will not find that there is a substantial probability of return by the 22nd, or even . . . within the 18 months at this point, given the lack of progress." We conclude the court's lack-of-substantive-progress finding was not supported by substantial evidence meeting the clear and convincing threshold. Although Mother may not have been able to consistently achieve positive results in dealing with difficult moments with the children, this relates more broadly to her overall progress "in resolving problems that led to the child's removal from the home" (§ 366.21, subd. (g)(1)(B)) and her "capacity and ability both to complete the objectives of [her] treatment plan and to provide for the [children's] safety, protection, physical and emotional well-being, and special needs" (*id.*, subd. (g)(1)(C)). These, however, are matters for the later stages of the dependency case. To hold Mother to these standards at the six-month review hearing would improperly conflate the different legal standards under section 366.21 and make the "substantive progress" requirement more onerous than it is intended to be. (See *M.V.*, *supra*, 167 Cal.App.4th at p. 182

29

[applying 12-month review standard to six-month review "ignores the balance of interests inherent in the statutory scheme"].)

In sum, we conclude the record does not support the juvenile court's finding that clear and convincing evidence demonstrated Mother's lack of substantive progress in her court-ordered treatment plan. (§ 366.21, subd. (e)(3); *M.V.*, *supra*, 167 Cal.App.4th at p. 176.)

**D.     Substantial Probability of the Children's Return**

The Bureau argues that even if Mother made the requisite progress contemplated in section 366.21, subdivision (e)(3), she cannot show there was a substantial probability the children could be returned to her by the 12-month review. On this score, the Bureau may be understood as urging that Mother was required at the six-month review hearing to show a substantial probability of subsequent reunification. On this specific point, we disagree.

Section 366.21, subdivision (e)(3), does not require a parent who has regularly participated and shown substantive progress in court-ordered treatment to *also* show a substantial probability of the child's return in order to receive continued services at the six-month review. Though the statute makes reference to a substantial probability test, it specifically provides that an *affirmative* substantial probability finding at the six-month review *mandates* continued services to the 12-month review. (See § 366.21, subd. (e)(3) ["If, however, the court finds there is a substantial probability that the child . . . may be returned to their parent or legal guardian within 6 months . . . the court shall continue the case to the 12-month permanency hearing."].)[6] We do not read the statute as permitting a juvenile court to

---

[6]     We also note the substantial probability standard at the six-month review stage ("substantial probability that the child . . . *may* be returned" [§ 366.21, subd. (e)(3), italics added]) is less demanding than at later review

30

terminate services at the six-month review based on a *negative* substantial probability finding where the parent has shown regular participation and substantive progress in the case plan.

We acknowledge that in *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018 (*Fabian L.*), the appellate court affirmed the juvenile court's decision to set a section 366.26 hearing at the six-month review stage despite the father's substantive progress in his court-ordered treatment. (*Fabian L.*, at pp. 1029–1030, 1031–1032.) We respectfully disagree with *Fabian L.* to the extent it concludes that section 366.21, subdivision (e)(3) "does not compel the court to order additional reunification services simply because a parent makes substantial progress with the court-ordered treatment plan" and additionally requires a showing of substantial probability of reunification at the six-month review stage. (*Fabian L.*, at p. 1031.) Notwithstanding *Fabian L.*'s reasoning, however, we believe it reached the appropriate result under a harmless error analysis.

"In general, harmless error analysis applies in juvenile dependency proceedings." (*In re M.S.* (2019) 41 Cal.App.5th 568, 590, disapproved on another ground in *Michael G.*, *supra*, 14 Cal.5th at p. 631, fn. 8.) Under harmless error analysis, "we must decide whether the error caused a miscarriage of justice." (*Id.* at p. 591.) Courts have interpreted that language as permitting reversal only if the reviewing court finds "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*

_____

stages ("substantial probability that the child *will* be returned" [§ 366.21, subd. (g)(1), italics added]). (See *M.V.*, *supra*, 167 Cal.App.4th at p. 180 [discussing these "distinct legal standards"].)

31

(1957) 46 Cal.2d 818, 836.) The same test applies in dependency matters. (*In re Celine R.* (2003) 31 Cal.4th 45, 59–60.)

*Fabian L.* involved unique circumstances in which the father was incarcerated at the time of the child's removal and would not be released until nine months after the six-month hearing. (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1030.) Furthermore, the case plan (which was comprised of vocational and self-study services that the father completed) did not include services for the father's drug abuse and domestic violence issues because such services were simply not available at the facility where he was incarcerated. (*Id.* at p. 1029.) While acknowledging the "seemingly unfair circumstances" at play, *Fabian L.* attributed the dilemma to the juvenile court's initial decision to order services that had "little or no likelihood of success" because the incarcerated parent was the only parent receiving services and would "be incarcerated longer than the maximum time periods for reunification efforts." (*Id.* at pp. 1030–1031.) On these facts, the reviewing court could appropriately have concluded there was no reasonable probability that continuing services at the six-month review hearing would have led to a more favorable result.

The same holds true here. Although the challenged order stems from the six-month review hearing, due to the actual elapse of time in this case, the 12-month review hearing was imminent.[7] Aware of the practical

---

[7]     Under section 366.21, subdivision (f)(1), the outer time limit for the 12-month review hearing is 12 months "after the date the child entered foster care, as that date is determined pursuant to Section 361.49." Section 361.49, subdivision (a), provides that a child is deemed to have entered foster care "on the earlier of the date of the jurisdictional hearing . . . or the date that is 60 days after the date on which the child was initially removed from the physical custody of their parent or guardian." Here, the earlier of those two dates was February 22, 2024, the date of the initial jurisdiction hearing.

implications of this timeline, the juvenile court made express findings that there was no substantial probability of the children's return by "the 22nd, or even . . . within the 18 months at this point, given the lack of progress, and as indicated by even mother's therapist, an inability to address those, or any indication that those issues would be addressed in the future." Critically, Mother does not argue these express findings were improper or unsupported by substantial evidence.[8]

Having carefully examined the entire record, we conclude it is not reasonably probable that Mother would have obtained a more favorable result but for the juvenile court's erroneous finding at the six-month review hearing that she failed to make substantive progress in her case plan. Assuming the court had ordered continuation of services to the 12-month review, that hearing would likely have commenced in short order (see fn. 7,

_____

Thus, the outer time limit for the 12-month review hearing was February 22, 2025, just over a week from the second day of the contested six-month review hearing.

[8] The parties do not address whether the juvenile court could have held a combined six- and 12-month review hearing on February 14, 2025, which was eight days before the 12-month mark, but we note case authorities would have allowed it to do so. (See *M.F.*, *supra*, 74 Cal.App.5th at p. 105 [no error in holding combined six- and 12-month review hearing]; *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1512 [where continuances "ran the clock out to 22 months, the contested 12-month hearing became the 18-month permanency planning hearing"]; *In re Brian R.* (1991) 2 Cal.App.4th 904, 918 [12-month review "became, by virtue of the passage of time, an 18-month permanency planning hearing"].) In *In re Candace P.* (1994) 24 Cal.App.4th 1128, the court held that because the statutory timeframes for review hearings are the "outer limits of time within which the review hearing may be held," it "seems clear" that a six-month review hearing may be held at a time less than six months from the prior hearing." (*Id.* at pp. 1132–1133.) Although the court believed it would be error for a juvenile court to order a review hearing after a period "substantially shorter than six months" (*ibid.*), no such circumstances are presented here.

*ante*), and there is little doubt the court would have found—and substantial evidence would have supported—that the children still faced a substantial risk of detriment to their safety, protection, or physical or emotional well-being if returned to the parents' physical custody. (§ 366.21, subd. (f)(1).) At that point, services could be continued until the 18-month review "only if" the court found "a substantial probability" that the children "will be returned" to the parents' physical custody "and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g)(1).) As we have discussed, in order to find a substantial probability of return at this stage, "the court shall be required to find" that the parent made "significant progress" in resolving the problems that led to the child's removal from the home, and demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1)(A)–(C).)

Here, notwithstanding Mother's substantive progress and commendable engagement in her case plan, the nearly year-long dependency case revealed shifting and deep dynamics in the family that continued to raise valid concerns about the safety and well-being of the children, who both had special needs. While the original protective issue of Mother's inappropriate physical discipline did not resurface, new and different problems became apparent. Mother withdrew and disengaged from the children during difficult moments, and Father showed his own propensity for inappropriate physical discipline, as well as a persistent refusal to seek or accept help. The case also revealed significant tensions between the parents, who intended to stay together but lacked the ability to effectively communicate and coparent. Meanwhile, visitation never elevated to unsupervised status, and the parents continued to rely heavily on others for

34

caretaking advice.  Although a Regional Center application was submitted on Mother's behalf at the time of trial, the status of that application is unknown. Even assuming Mother has begun receiving Regional Center services, we cannot ignore that her own therapist—with whom she had engaged in weekly therapy sessions since September 2024—did not believe that Mother "will be able to make the necessary changes even if she were to be given additional services."

Taken together, the evidence points to the conclusion that Mother would not be able to show "significant progress in resolving problems that led to the child's removal from the home" or "the capacity and ability both to complete the objectives of [her] treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs" in order to demonstrate a substantial probability that the children "will be returned" by the 18-month review hearing.  (§ 366.21, subd. (g)(1).)

For these reasons, we conclude the juvenile court's decision to terminate services at the six-month review hearing, though erroneous, was ultimately harmless.  Notwithstanding the harmless error conclusion we reach on this particular record, we emphasize the importance for the juvenile courts to apply the correct standards in each phase of the dependency proceedings, which is essential to maintaining the escalating nature of the statutory process and the balance of interests inherent in it.

## DISPOSITION

The petition for extraordinary writ is denied.

35

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.

Trial Court:      Contra Costa County Superior Court

Trial Judge:      Hon. Colleen Gleason

Counsel:      Windansea Law Offices, Tracy Marie De Soto, for Petitioner

               Thomas Geiger, County Counsel, and Janice Amenta, Deputy County Counsel, for Real Party in Interest.

*B.D. v. Superior Court Contra Costa* (A172485)

37